**BARNHILL v. UNITED STATES.**

No. 1576.

Circuit Court of Appeals, Tenth Circuit.

April 12, 1938.

H. G. Metos, of Salt Lake City, Utah (E. A. Rogers, of Salt Lake City, Utah, on the brief), for appellant.

John S. Boyden, Asst. U. S. Atty., of Salt Lake City, Utah (Dan B. Shields, U. S. Atty., and Scott M. Matheson, Asst. U. S. Atty., both of Salt Lake City, Utah, on the brief), for the United States.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

Jesse F. Barnhill, James W. Morris, Dean V. Johnson, Asa L. Eddy, and Marcus L. Eddy, were charged by indictment containing five counts with having used the mails in furtherance of a scheme to defraud in violation of section 215 of the Criminal Code, 18 U.S.C.A. § 338.

Asa L. Eddy and Marcus L. Eddy entered pleas of guilty. Barnhill, Morris, and Johnson having entered pleas of not guilty were tried; Morris and Johnson being acquitted, and Barnhill convicted on each of the five counts. Barnhill has appealed.

At close of the evidence counsel for Barnhill interposed a motion for a directed verdict, ground therefor not being specified. It is here contended that no substantial evidence was introduced by prosecution to prove charges set out in the indictment, the Government claiming that since no specific ground was set out in the motion for a directed verdict the sufficiency of the evidence should not be reviewed.

■ A motion for a directed verdict necessarily presents the question of law to the trial court as to whether there was any substantial evidence to support the allegations of the indictment. Isbell v. U. S., 8th Cir., 227 F. 788; and West v. U. S., 10th Cir., 68 F.2d 96.

In first count is set out a general scheme and the mailing of a letter in furtherance thereof. Each of the other counts by allegation refers to part of count one embracing same general scheme and the mailing of letters in furtherance thereof.

The substance of the charge with respect to the scheme and use of the mails is that defendants would obtain large quantities of a certain natural mineral deposit mined in Nevada, mixing such deposits with water, Epsom salts, Glauber's salts, potassium iodide, glycerine, saccharine, and flavoring materials and then bottle such mixture and label same under trade-name of "Ionite"; that defendants would and did represent to the persons to be defrauded that said Ionite if taken by tubercular persons eliminated fever, caused pulse rate to

become normal, produce negative sputum tests and a normal blood count, such persons gaining weight; that said Ionite mixture was speedy, complete and certain cure for tuberculosis, destroying the tubercular germs within the body in tubercular cases where approved scientific methods had completely failed, and further charged that defendants represented that defendant Johnson had nothing to sell and his only motive in advertising Ionite was benevolence; that all efforts of tubercular specialists in behalf of Johnson had completely failed and Ionite had saved his life; that Johnson underwent a physical examination of May 25, 1935, which included the taking of X-ray pictures and the physician having examined Johnson, including the X-ray pictures, stated that the right lung of Johnson's was perfect; that cavity in the left lung caused by the tubercular bacilli had been reduced in diameter to size of a five-cent piece; and that Ionite was the only remedy that had given Johnson any effective relief from tuberculosis which he had had for at least three years, such Ionite having killed the tubercular germs within his body.

It further charged that defendants represented that a certain child, Delane Greene, had suffered from tuberculosis for a period of two years or more, all efforts of physicians in his behalf having failed; that physicians had informed mother of Delane that they could do nothing for him, but that he was restored to healthy normalcy by said Ionite; and that he was a "remarkable, living, breathing, walking, running testimonial of almost unbelievable and miraculous effects of what 'Ionite' has done to and for a tuberculosis person."

The indictment further charges that defendants well knew that said Ionite if taken by a tubercular person would neither eliminate fever, nor cause pulse rate to become normal, nor produce negative sputum tests, nor normal blood count, nor cause tubercular persons to gain weight, nor produce speedy, complete, or certain cure for tuberculosis, but was in fact harmful and contrary to approved scientific medical advice and treatment of tuberculosis, and would not kill tubercular germs within the body; that Johnson's motive was not benevolence but monetary profit, and that specialists had made headway with said Johnson and Ionite had not saved his life; that the physician who examined Johnson and X-ray pictures on May 25, 1935, did not state that his right lung was perfect, or that he had nothing to

worry about, but on the contrary advised him that he had active tuberculosis with some infiltration in right lung, and did not tell him that cavity in left lung had been reduced in diameter to size of a five-cent piece, but in fact told him that it had increased in size since May 3, 1935, and was much larger than a five-cent piece.

It further charged that Johnson had received considerable and positive relief from pneumo-thorax treatments and had received no relief by the use of Ionite, and that Ionite had not killed tubercular germs in his body.

The indictment then charged that defendants knew that Delane was not a tubercular person and had not been restored to healthy normalcy by Ionite and that physicians had not informed his mother that they could do nothing for him.

It then charged that all of the aforesaid representations were intended to be and were deceptive, false, and fraudulent and made with the intent and purpose to defraud certain persons by causing them to pay over sums of money to them for said Ionite.

Barnhill and Morris being owners of a mine containing a mineral clay located in Nevada, same as mined was brought by them to Salt Lake City, Utah, there having Asa L. Eddy, a registered pharmacist, to mix such mineral clay with certain other ingredients and bottle it under the tradename of Ionite. An analysis of a bottle of such liquid disclosed that it contained 12.8 grams of silica in 100 cc's, calcium 1.46 grams in 100 cc's, Glauber's salts 8.32 grams in 100 cc's, potassium iodide, 1.23 grams in 100 cc's, iron oxide, 1.5 grams in 100 cc's, and also aluminum, phosphate, glycerine, saccharine, a trace of manganese, copper, and other metals.

Asa L. Eddy testified that he received a mineral deposit from Barnhill and Morris and in mixing same put 20 pounds of such mineral, 8 pounds of Glauber's Salts, 8 pounds of Epsom salts, 3 ounces of potassium iodide, 1 gallon of glycerine, 30 grains of vanilla extract, and 5 gallons of water, to make 108 bottles (12 oz.) of Ionite.

In the early part of 1935, Dean V. Johnson of Pleasant Grove, Utah, commenced using Ionite. Thereafter, advertisements were inserted in the Denver Post in the Personal Column headed "All tuberculars, notice," appearing in issues of April 7, 1935, May 5, 1935, June 2, 1935, June 9, 1935, September 20, 1936, March 14, 1937; with

exception of advertisements of September 20, 1936, and March 14, 1937, which appeared under name of "Ionite Products" and "Ionite," the other advertisement being signed by Dean V. Johnson, Pleasant Grove, Utah.

Advertisements of June 2, 1935, and June 9, 1935, in lengthy detail tell how Johnson was suffering from tuberculosis, having had it for three years in all stages; that all efforts of tuberculosis specialists had failed; and that he had found a wonderful mineral which he began using January 9, 1935, and since such time had gained in weight 15 pounds, his temperature returning to normal, and had seven negative sputum tests, and two wonderful blood counts. In such advertisement he appealed to the tuberculars, asking them to use common sense and fight tuberculosis, stating: "Why not just kill the germs?"

Johnson, receiving many inquiries from tuberculars asking about Ionite, replied, telling about (his) Johnson's experience with Ionite and where it could be obtained. Advertisements and many letters were introduced in evidence, along the same lines, bragging on and extolling the wonderful results which could be procured by the use of Ionite.

Mrs. Lorin J. Yates testified that continuously during the portion of the years 1934 and 1935 she was a stenographer for Barnhill and Morris and knew Johnson; that she typed letters which Barnhill dictated and placed on such letters the initials "DVJ-BW"; that the initials "DVJ" stood for Johnson, and "BW" were her initials prior to her marriage; that Johnson signed the letters, but Barnhill dictated them; and in each letter she inclosed a sworn statement of Johnson which Barnhill had dictated; that mimeographed copies were made of such sworn statements, a large supply being on hand; that letters were sent out at Barnhill's direction to people all over the United States; that people wrote letters to Johnson asking about Ionite and he brought them or mailed them to Barnhill's office. She also testified that she typed an affidavit signed by Mrs. Helene Greene, which was dictated by Barnhill, and also the letters signed by M. L. Eddy on the stationery of the First Avenue Drug Company (the distributor of Ionite), were dictated by Barnhill.

The sworn statement dated April 2, 1935, of Johnson, which was dictated by Barnhill and sent out with replies to letters inquiring about Ionite, in which it was stated that Johnson contracted tuberculosis about three years prior thereto, going through the various stages of the disease, including hemorrhage, with cavity in the lung and high and low temperatures, and general miseries, and had spent about a year and a half in bed; that tuberculosis specialists had told him that even with pneumo-thorax treatments he would not be well within two or three years more; that he commenced taking such treatments in November, 1934, and continued until January 9, 1935, with no apparent improvement; that on the latter date some friends told him of Ionite which they said contained practically all the mineral salts composing the human body, and that a number of tuberculars had secured beneficial results therefrom; that he began using Ionite and within ten days gained about 15 pounds and his temperature returned to normal; that he is still gaining and has a wonderful appetite; that after one month's use of Ionite he began getting sputum tests from the State Board of Health; that all prior tests were positive; that after February 1, 1935, and for a period of 50 days he had five consecutive negative tests and no positive tests, and because of such fact, reasoning led him to believe that Ionite killed the tubercular bacilli within his body.

The sworn statement of April 12, 1935, dictated by Barnhill and signed by Mrs. Helen Greene, stated that she was the mother of Delane Greene and from the time of his birth, April 16, 1928, he had never been strong; that he took cold easily and in September, 1933, was stricken with scarlet fever, spinal meningitis, retrofranangel abscess at the back of the throat, and pneumonia; that in July, 1934, he had another attack of pneumonia; that the family doctor, after an examination, stated that he had tuberculosis; that following this diagnosis she had three different recognized tuberculosis specialists at different times examine her son, and was informed by each that Delane had tuberculosis; that they heard of Ionite and on January 15, 1935, secured a supply, and within 10 days the boy began to improve; that he coughed less, regained his appetite, and began putting on flesh, and such improvement was so rapid that on March 13, 1935, he was able to resume his school work; and that he has gained 21 pounds in weight and is now up to normal. The statement also contains many laudatory remarks about Ionite.

Under date of July 15, 1935, the First Avenue Drug Company, operated by M. L. and Asa L. Eddy, wrote a letter to Mr. A. Reeves of De Beque, Colorado, in which it stated that it had received a letter from Dean V. Johnson requesting that it make to all of those requested an offer of Ionite on a "money back" guaranty, and that a letter was forwarded to Johnson stating that it would get out letters making the offer requested and that in compliance therewith it was offering Ionite on a "money back" guaranty based absolutely on the performance of the merchandise, the purchaser to be the sole judge of the merits or demerits thereof, such offer to include a refund on the first two bottles used.

The foregoing discloses the plan whereby Ionite was marketed and the representations made through advertising and correspondence to the prospective purchasers, the mails being used for such purpose.

Evidence which bears upon the truth and good faith of such representations was also introduced.

On May 17, 1936, Johnson wrote to a Mr. Spearline telling him that he took a tonic which he thought helped him for some time, but did not know of anyone who had a very good cure for tuberculosis and that he advised that if Spearline could afford it a good physician might help him more than anything.

On June 2, 1936, he wrote to Lester Mangum requesting information in connection with relief work, stating that he had had tuberculosis for nearly three years; that his folks had managed to stay off relief rolls and were supporting him but that there was not enough money for expensive medical treatment; that local physicians had done about all they could with their limited experience and he would like to know if there was any relief help that could be had in cases of his kind.

Mrs. Alice Bottom testified that she read an ad in the Denver Post and wrote Dean Johnson; that thereafter she ordered Ionite from the First Avenue Drug Store and her husband started taking it in June, 1935; that while he was taking the first bottle he thought it was helping him; that after he started taking the second bottle he began getting worse, had vomiting spells, got numb, and his heart started going back on him; that her husband died on May 15, 1936; that he stopped taking Ionite on July 21, 1935, and she returned the third bottle and got her money back.

George Schermerhorn testified that he saw an ad in the Denver Post in April, 1935, and that his wife wrote to Johnson, receiving a reply referring her to the First Avenue Drug Company; that she wrote and got some Ionite and commenced taking it; that she took between 18 and 21 bottles; at the time she started she was walking around and doing her housework; that she continued to lose weight until she went to the hospital on July 7, 1936, where she now is; that after his wife went to the hospital he wrote asking for a refund and never received a reply.

Dr. John Giesy testified that he had known defendant Morris for many years and had known Barnhill since 1934; that on May 23, 1935, Barnhill and Morris and Johnson were in his office; that he had on March 28, 1935, examined Johnson and found evidence of a tubercular cavity in the apex of the left lung; a partial collapse of the left lung remaining from pneumothorax treatments; that he again examined Johnson when Barnhill was present on May 13, 1935, at which time he was not in as good condition as he had been in March, 1935, as the pulse and respiratory action was more rapid, and there seemed to be an extension of the cavity; that an X-ray and sputum test was made by Dr. Ogilvy at that time; that on May 23, 1935, in the presence of Barnhill and Morris he again examined Johnson and found evidence of still greater extension of the cavity; that he had an X-ray taken which was compared with previous X-rays, and gave an opinion that the X-ray showed an extension of the cavity and spread of the infection and that the sputum tests showed the presence of tubercular bacilli; that he discussed the matter of Ionite in a general way and stated that he did not believe in this particular case that it was effective.

Dr. R. J. Friel testified that Johnson came to his office on November 16, 1934, as a patient, and he made a diagnosis of far-advanced tuberculosis, with cavitation, and advised immediate pneumo-thorax; that he put him in Holy Cross Hospital and his primary collapse began; that from December 1, 1934, to March 7, 1935, which was the last time he saw him, Johnson had gained from 159 pounds to 175 pounds, his sputum becoming negative and his temperature normal; and that he got an excellent collapse.

Dr. James P. Kerby testified from X-ray pictures of Johnson taken June 28, 1934,

November 13, 1934, March 28, 1935, May 24, 1935, May 25, 1935, June 25, 1935; and August 3, 1935, that examination was made and the picture of June 28, 1934, showed slight to moderate tuberculosis in the upper lobe of the right lung, and extensive tuberculosis infection in the upper lobe of the left lung with a cavity about the size of a large strawberry; that the picture of November 13, 1934, shows very little change and cavity in the left lung slightly larger; that the picture of March 28, 1935, showed the same condition in the right lung and left lung to have been collapsed to between one-third and one-half of its proper size with cavity scarcely visible; that the picture of May 3, 1935, shows the same condition in the right lung and cavity in the left lung more apparent; that the picture of May 24, 1935, shows the right lung about the same and the cavity in left lung slightly smaller than before the pneumo-thorax treatments; that the picture of May 25, 1935, shows right lung about the same and cavity in the left lung smaller than it appeared in the picture of November 13, 1934; the picture of June 25, 1935, was about the same as the previous picture.

Dr. J. W. Hayward testified that he took the X-ray pictures of Johnson of June 28, 1934, May 3, 1935, May 25, 1935, June 25, 1935, and August 2, 1935; that the picture of May 25, 1935, shows a slight infiltration in the upper part of the right lung, and that the cavity shown in the left lung was somewhat larger than a nickel; that he did not recall telling Barnhill and Johnson that the right lung was perfect, or that the cavity in the left lung was reduced to the size of a nickel.

E. H. Branhall testified that he was an employee of the State Board of Health and director of the laboratory and during 1935 several sputum samples came through the mail from Dean Johnson for analysis; that the analysis of December 5, 1934, was positive, the one of February 27, 1935, negative, the one of March 9, 1935, negative, March 19, 1935, negative, March 26, 1935, negative, April 5, 1935, April 16, 1935, and April 30, 1935, were negative, and May 29, 1935, positive.

B. F. Anger, a post office inspector, wrote for Ionite, stating that he had had TB for 20 years and he wanted to be completely cured of it, as other medicines were no good. He received two bottles of Ionite which he turned over to the Food and Drug Administration.

He further testified that he had an interview with Barnhill, Johnson, and Morris; that Barnhill told him that he and Morris had a mineral which they had Eddy, a registered pharmacist, prepare and handle; that Barnhill stated that he paid for everything; that he placed the advertising in the Denver Post, prepared the statements of Johnson and Mrs. Helene Greene, and took care of all of the mail order business and letters; that Barnhill also told him that they had sold 3,348 bottles at $2 a bottle, and the gross receipts would figure between four and six thousand dollars; that he asked Barnhill if the remedy would cure tuberculosis and Barnhill replied, "that he did not claim it would cure tuberculosis; that the only thing he knew was what it did for Johnson"; that he asked Barnhill if Johnson was cured and Barnhill replied that "he wouldn't say he was cured, but he thought he was benefited."

Mrs. Helene Greene, the mother of Delane Greene, as a witness for the defendants, on cross-examination testified that she signed the affidavit which was sent out through the mails to tuberculars in reply to inquiries, having given to Barnhill the information contained in such affidavit. However, she stated that the doctor did not say anything about her son having tuberculosis; that she never had an X-ray taken, and that she did not have her son examined by three specialists, and that statement was not true, and she did not tell Barnhill that in exactly that way.

Defendant introduced considerable evidence attempting to prove his good faith and many letters from users of Ionite which showed that they thought they were receiving benefit from such use.

The representations made by Barnhill in the advertisements and letters made a strong appeal to those suffering from tuberculosis, the literature being couched in terms of high-powered salesmanship. Furthermore, the prospective purchaser of the Ionite is given to understand that it will kill the tubercular germs in his system. Statements are also made in the affidavits and literature sent out to prospective purchasers which the evidence shows are false. The advertising under Johnson's name and the letters sent out appealed to tuberculars to let the Ionite kill the germs since it was stated therein that Ionite killed the germs in his body. The evidence shows he still has tuberculosis. The literature also represents that an examination made after he

had taken Ionite for a short period of time disclosed a right lung in perfect condition and a left lung with a cavity the size of a nickel. The physician who made such examination testified that he advised Johnson and Barnhill that the right lung was still involved and did not tell them that the cavity in the left lung had decreased to the size of a nickel. The testimony of Mrs. Greene discloses that some of the statements in the affidavit prepared by Barnhill and signed by her were false.

■ Regardless of merits or demerits of Ionite, the jury was justified in finding from the evidence that the representations made were known by appellant and other defendants to be false. That is sufficient to sustain the charge under the indictment. Stunz v. U. S., 8th Cir., 27 F.2d 575; Corliss v. U. S., 8th Cir., 7 F.2d 455; and West v. U. S., 10th Cir., 68 F.2d 96. Error was not committed in overruling motion for a directed verdict, there being substantial evidence to support same.

As to assignments with respect to instructions, neither were any objections made nor exceptions saved.

Contention is made that the court erred in failing to instruct the jury as to effect of a promise to refund the price if made and carried out in good faith, no request being made for such instruction.

The offer to refund was not an absolute promise to refund the purchase price of all Ionite furnished, but merely to refund on the first two bottles. It is highly probable that a man seriously affected with tuberculosis, and groping for a straw to save his mortal existence for psychological reasons might reasonably at first be deceived into believing he was receiving benefits. Furthermore, it is likely that a person in such a condition of health would purchase more than two bottles and the refund offer might be considered a part of the scheme to induce such a person to get started in order to sell him many bottles of Ionite and make a nice profit even in face of a refund for two bottles. Some of the misrepresentations did not pertain to matters about which there could be a difference of opinion, relating to facts about which there could be no mistake.

The court, among other things, instructed the jury:

"You are the sole judges of the weight of the evidence, the credibility of the witnesses and of the facts. * * *

"All presumptions of law independent of evidence are in favor of innocence, and a man is presumed to be innocent until he is proven guilty beyond a reasonable doubt and in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to an acquittal."
* * *

"A person might make misrepresentations with regard to the best thing in the world,—as you very well know. But all of the evidence here that tends to throw any light upon the good faith or the bad faith of the defendant or any or either of them in respect to the representations made with respect to this remedy, are matters to be considered and fairly weighed by you.

"But remember always that they are on trial here for bad faith, false and fraudulent representations with respect to this remedy. You must find first that there were representations, and what they were, and whether they were false and fraudulent within the meaning of that language as I have over and over attempted to explain to you.

"Mr. Boyden: I don't know whether your honor has purposely omitted government's requested instruction 4, with reference to representations being made by implication from the words, if not said directly.

"The Court: That is simply a definition.

"Counsel requests that I instruct you, which properly applied is a rule for you to use in determining what are representations.

"The representation made here are contained in these letters and affidavits, as I recall, and possibly the label upon the bottle —I have not read it.

"Mr. Boyden: And the newspapers, too.

"The Court: And the newspapers also contain it. But I think they are largely copies of the letters and affidavits, as I recall them.

"A representation may be made expressly or it may be gathered from the whole tenor, or partially so, from the entire writing or language used. Representations made are those which it is intended by the party to be acted upon by those to whom it might be addressed.

"What representations were made by these letters, newspapers writings and affidavits that are in evidence before you is for you to determine after reading them

122

and comparing them one with the other and determining what fair inference may be drawn from the contents. In other words, counsel has requested and I give it in the form as requested.

"You are instructed that fraud or deception to justify conviction for using the mails to defraud may be by implication reasonably derived by the reader of the representations made, as well as by the express words.

"Any modification of that you can think of?

"Mr. Rogers (Attorney for Defendant): No, I think not. I think that is all right.

"The Court: Want to take any exceptions?

"Mr. Rogers: No, your honor."

The court in effect instructed the jury that they should consider all of the evidence which threw any light upon the good or bad faith of the defendants in respect to the representations made with respect to Ionite.

The instructions protected defendant's rights. Counsel for defendant seemed to think so at the time of the trial.

See McLendon v. United States, 6th Cir., 13 F.2d 777; Stunz v. United States, supra; and Harrison v. United States, 6 Cir., 200 F. 662, supra.

The judgment of the lower court should be, and is, affirmed.