ALAMEDA REALTY CORPORATION, ET AL.,[1] PETITIONERS, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 81274, 81412, 83569. Filed April 22, 1964.

*Douglas D. Drysdale* and *Robert E. Stroud*, for the petitioners.
*W. Ralph Musgrove*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in income tax, and addition to the tax under section 6653(b) of the Internal Revenue Code of 1954[2] of Alameda Realty Corp. for the calendar year 1955 in the amounts of $31,005.44 and $15,502.72, respectively, and determined deficiencies in income tax, and addition to tax under section 6653(b), of Raymond E. and Irma M. Hanly for the calendar year 1955 in the amounts of $50,126.99 and $25,063.50, respectively. Respondent also determined that Raymond E. and Irma M. Hanly were liable as transferees of the assets of Alameda Realty Corp. for the deficiencies in income tax and addition to tax due from that corporation for its calendar year 1955 and asserted such transferee liability to be in the amount of $46,508.16.

Raymond E. and Irma M. Hanly at the trial conceded that they are liable as the transferees for any deficiencies due from Alameda Realty Corp. for its calendar year 1955 and respondent conceded that neither the corporation nor the individual petitioners is liable for the addition to tax determined by him. Petitioners also conceded other issues raised by the pleadings in these cases, leaving for our decision the following:

(1) Whether Alameda Realty Corp. adopted a plan of complete liquidation on or before the date of the sale of its only operating asset, and within 12 months from the date of the adoption of such plan distributed all its assets among its stockholders in complete liquidation.

---

[1] The following proceedings are consolidated herewith: Raymond E. Hanly and Irma M. Hanly, docket No. 81412; and Raymond E. Hanly and Irma M. Hanly, docket No. 83569.

[2] All references herein are to I.R.C. 1954 unless otherwise indicated.

(2) Whether the distributions received by Raymond E. and Irma M. Hanly from Alameda Realty Corp. during the calendar year 1955 constitute distributions in complete liquidation of that corporation or taxable dividends.

(3) Whether Raymond E. and Irma M. Hanly realized a gain on the sale of their residence in Haddonfield, N.J., during the year 1955.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioners Raymond E. and Irma M. Hanly (hereinafter sometimes referred to as Raymond and Irma), husband and wife residing near Charlottesville, Va., filed a joint Federal income tax return for the calendar year 1955 with the district director of internal revenue at Richmond, Va.

Petitioner Alameda Realty Corp. (hereinafter sometimes referred to as Alameda) is a dissolved corporation of the State of New Jersey. Its income tax return for the year 1955 was filed with the district director of internal revenue at Camden, N.J.

Prior to 1954, Raymond and Irma lived in Haddonfield, N.J., which is near Camden, N.J. Raymond had been engaged in the real estate and insurance businesses in that area for many years, and from about 1936 Irma had worked for him as his secretary. Sometime in December of 1953 Raymond and Irma purchased a motel property known as the Town and Country Motor Lodge (hereinafter sometimes referred to as Town and Country) near Charlottesville, Va. In the summer of 1954 they moved from New Jersey into quarters on the motel property in Virginia and thereafter devoted most of their time to the motel operation which they began to expand. Town and Country was not incorporated but was owned and operated by Raymond and Irma as individuals. On January 19, 1955, Raymond and Irma sold their personal residence in Haddonfield, N.J., for $42,500 and used the proceeds from this sale in the operation and expansion of Town and Country.

Alameda was incorporated under the laws of New Jersey on March 6, 1942. Its initial business activity was the construction of houses. For some time during World War II, Alameda was inactive, but petitioners paid its franchise taxes in order to keep the charter active. At all times here relevant, all of the outstanding capital stock of Alameda was owned by Raymond and Irma.

On March 23, 1945, Alameda purchased an office building known as the Finance Building, located at the corner of Sixth and Cooper Streets in Camden, N.J., for $72,000 paying $17,000 in cash and giving a note secured by a mortgage for the balance. Thereafter the Finance Building was Alameda's sole operating asset and rentals from the various tenants were its sole source of income.

After Raymond and Irma moved to Virginia an attorney who had offices in the Finance Building collected the rents for Alameda and notified Raymond or Irma of other problems which required attention, such as complaints of tenants.

In early 1955 Raymond and Irma borrowed $35,000 from Raymond's brother, $10,000 on one occasion and $25,000 on another. This money was used in the operation or expansion of Town and Country. Subsequent to making this loan, Raymond's brother asked for security therefor, and Raymond and Irma had Alameda give him a second and a third mortgage on the Finance Building.

In late September 1955 Raymond made a trip to Camden to consult an oculist. This doctor informed Raymond that he understood that a man named Limeburner, an officer of J. E. Limeburner Co., one of Alameda's tenants, was interested in purchasing the Finance Building. At this time the Finance Building had not been listed or advertise for sale. Raymond called upon Limeburner and received an offer from him to purchase the Finance Building for $175,000.

On his return to Charlottesville, Raymond discussed Limeburner's proposal with Irma. They considered the offer a fair one and since the Finance Building was the only asset of Alameda decided to see if Limeburner would buy their Alameda stock. Limeburner was not interested in buying the Alameda stock so Raymond and Irma decided to have Alameda sell them the Finance Building and, after paying off any indebtedness of Alameda, take the remaining money to use in Town and Country and let the corporation "die." The principal reasons Raymond and Irma had for reaching this decision were the difficulty they had encountered in managing the Finance Building as absentee landlords and their need for additional funds for further expansion of Town and Country. Raymond and Irma formed their intention to have Alameda sell the Finance Building and distribute to them the proceeds of the sale in excess of amounts needed to pay the corporate debts sometime between the end of September and October 6, 1955.

On October 6, 1955, petitioners caused Alameda to enter into a written contract for the sale of the Finance Building to J. E. Limeburner Co., at a price of $175,000, of which amount $17,500 was paid to Alameda as earnest money on signing of the contract. The sale of the Finance Building in accordance with the contract was completed by the giving of the deed by Alameda on November 1, 1955. At the time of the sale, the adjusted basis of the Finance Building in the hands of Alameda was $50,785.74. The proceeds to Alameda from the sale taking into account adjustments for taxes were $71,610.25, made up of the $17,500 paid in earnest money and $54,110.25 paid at the closing. In addition the purchaser assumed the indebtedness on the property

including the $35,000 of personal debt owed by Raymond and Irma to Raymond's brother and secured by second and third mortgages on the Finance Building.

No formal meeting of stockholders was ever held to adopt a formal plan of liquidation or a resolution of dissolution for Alameda. Alameda did not file with respondent a Form 966 (return of information to be filed by corporations within 30 days after adoption of resolution or plan of dissolution or complete or partial liquidation). The certificates evidencing Alameda's outstanding stock were never formally canceled. Alameda's charter was revoked by the State of New Jersey on February 2, 1959, for nonpayment of franchise taxes.

Minutes of a special meeting of the directors of Alameda (Raymond and Irma) on October 29, 1955, were prepared and the following resolution concerning the sale of its only operating asset was adopted:

RESOLVED: that a deed be executed by the proper officers of Alameda Realty Corporation to be delivered to J. E. Limeburner Co., of the State of Pennsylvania covering the premises known as the Finance Building, N.W. corner of 6th & Cooper Streets, Camden, N.J. which deed is to be delivered upon receipt of the consideration therefor, it being understood that the purchaser, J. E. Limeburner Co. will assume all mortgages now on the property.

FURTHER RESOLVED, That Raymond E. Hanly be authorized to act in behalf of Alameda Realty Corporation in all matters connected with this settlement.

The minutes of this meeting were prepared by Irma. After reciting the foregoing resolutions, the minutes stated that since there was no further business, the meeting was adjourned.

As the sole stockholders of Alameda and as its officers and directors, it was not the practice of Raymond and Irma to hold formal meetings or ordinarily to prepare minutes to record their acts. This was consistent with their past practice in connection with other corporations of which they were sole stockholders. Over the years, they had been sole or part owners of a number of corporations.

Irma's experience in drafting minutes was limited to those authorizing the sale of real estate by the various corporations in which she and Raymond had been stockholders. In order to satisfy the requirements of title insurance companies operating in New Jersey, it was necessary to provide the title insurance company with a copy of the resolution of the board of directors authorizing the sale of real property owned by a corporation. In drafting the minutes of the directors meeting of Alameda of October 29, 1955, Irma followed as a model similar minutes previously drafted changing the name, date, and description of property as she had done in other instances when she prepared minutes of meetings of corporate directors authorizing sales of real property. The minutes of October 29, 1955, of the meeting of Alameda's directors were prepared solely to satisfy the requirements of the title company in connection with Alameda's sale of the Finance Building.

While living in New Jersey Raymond had been a stockholder in and a director of Haddonfield Villas, Inc., together with certain other persons. This corporation had been engaged in subdividing real property. The minutes of this corporation disclose that on December 31, 1952, the directors adopted a formal resolution to the effect that it had been agreed to dissolve Haddonfield Villas, Inc., prior to, but not later than, May 1, 1953. Haddonfield Villas, Inc., had not, however, been formally dissolved as late as June 30, 1955. On that date Raymond wrote to a New Jersey attorney who had been a stockholder and director of Haddonfield Villas, Inc., stating that he had continued to receive delinquent tax notices issued to the corporation and requesting the attorney to let him "know how we stand on this situation" since he was "concerned to be getting notices such as the enclosed." In response to Raymond's letter of June 30, 1955, the attorney wrote to him on July 5, 1955, stating in part as follows:

Please do not worry about the delinquent notices. It is the custom of the Corporation Tax Bureau to send these notices out for several years. After a while, the usual step is an involuntary dissolution of the corporation by the State of New Jersey for the non-payment of taxes.

To go through with voluntary liquidation would have to entail considerable expense and we decided in this case, as well as in others involving similar situations, to let the State dissolve it rather than dissolve it ourselves. Very recently we received a notice that one of the corporations in question had been dissolved for non-payment of taxes. I might add that this is a rather well recognized procedure.

The minutes of the December 31, 1952, meeting of Haddonfield Villas, Inc., referred to previously were prepared by an attorney although signed by Irma as the corporate secretary. Irma as secretary of many corporations in which Raymond had owned stock in New Jersey had signed minutes prepared by others.

After the sale of the Finance Building on November 1, 1955, Alameda transacted no further business, except to pay whatever bills it might have had and to make distributions to its stockholders. Between October 6, 1955, the date of the contract of sale on which day $17,500 in earnest money was received by Alameda, and November 1, 1955, the date the sale was closed, Alameda paid to or for the benefit of Raymond and Irma a total amount of $7,710.84. In November Alameda paid to or for the benefit of Raymond and Irma an amount of $37,925.53, and in December $13,786.64. Raymond and Irma caused Alameda to issue for their benefit its check for $1,200 to Town and Country on January 6, 1956, and also caused a check to be drawn on Alameda's account for $119.87 on April 24, 1956, closing out the account.

Prior to October 6, 1955, Raymond and Irma had borrowed money from Alameda. There was on the books of Alameda an account en-

titled "Town and Country Motor Lodge." A debit entry of $57,548.65 was made in this account under date of December 31, 1955, making a debit balance of $61,284.80 as of that date. Under date of December 31, 1955, a credit of $61,284.80 was entered with the explanation of "J 606" to close the account. Raymond and Irma did not repay the money they had borrowed from Alameda. They considered it impractical to repay the corporation and then have the corporation return the money. They considered that the cancellation of their indebtedness by Alameda was part of their payment for their Alameda stock. When Alameda's books of account were closed out as of December 31, 1955, the corporation in fact had $1,319.87 in its bank account.

On or about April 15, 1956, Alameda filed its 1955 calendar year Federal income tax return. This return was marked "Final Return" and its closing balance sheet showed "None" for both "Total Assets" and "Total Liabilities and Capital." It showed as "Total distributions to stockholders charged to earned surplus during the taxable year" a total amount of $96,777.23. Raymond and Irma obtained no legal or other professional advice as to the Federal income tax consequences of the actions they were taking with respect to the sale of the Finance Building and disposition of the proceeds of such sale.

Raymond and Irma continued to pay New Jersey real estate brokers' license fees and country club dues for 1956 and 1957. However, when they moved from New Jersey to Virginia they did not intend to return to New Jersey. After they sold Town and Country in 1958, they continued to reside near Charlottesville.

The total dollar amount of withdrawals and other proceeds realized by Raymond and Irma from Alameda during 1955 was $122,873.62. Of this amount (1) $59,423.01 was withdrawn in cash during the period October 11 through December 31, 1955; (2) $28,450.61 was in the form of forgiveness of indebtedness owed by Raymond and Irma to Alameda for amounts borrowed from the corporation prior to October 6, 1955; and (3) $35,000 represented the assumption by the purchaser of the Finance Building of the personal debt owed by Raymond and Irma to Raymond's brother.

The basis of the Alameda stock to Raymond and Irma was $1,000.

The Haddonfield, N.J., residence of Raymond and Irma which they sold on January 19, 1955, had been constructed under Raymond's supervision between February and December 1946. At the time of trial Raymond and Irma had no records to show the cost of the residence. They had kept the records showing the cost of construction of this residence until sometime in 1958. These records were stored along with other records which Raymond and Irma were keeping in the basement of Town and Country. During 1958 a leak occurred in this basement and the records showing the construction cost of the

residence were damaged by water. When Raymond and Irma examined these records at the time in 1958 when they were moving from Town and Country they considered them to be so badly damaged as to be illegible and unusable and therefore destroyed them. Respondent's special agent first contacted Raymond and Irma on July 23, 1958. At that time he was told of the sale of their New Jersey residence. This agent asked for all records of every kind over a 10-year period ending in 1957. The individual records of the Charlottesville operation were furnished to him but not the corporate records. At a conference on April 15, 1959, Irma told this agent that she had had records of the cost of building the residence in Haddonfield but had burned them.

The construction of the house in Haddonfield was of a very fine quality. On February 1, 1946, Raymond obtained a permit from the Federal Government to build this house. At the end of February various restrictions on the building of residential housing had been imposed by the Government, which, however, did not prohibit the construction of this house which had been started under the permit which had been granted. However, Raymond had to obtain the materials where he could find them. In this early postwar period building materials were scarce, and steel, copper, and millwork could not be obtained at discount prices by Raymond even though he was a builder but could only be obtained by paying the asking price.

The house was built on two lots each 70 by 160 feet, making a total of 140 by 160 feet. One of these lots had cost $2,500. The house has, on the first floor, an oval foyer with a hanging stair, a living room with a fireplace with marble insert mantel, a dining room, kitchen, two other rooms, two full baths, and an outdoor living room, closed in and jalousied, with a floor of Pennsylvania quarry tile. The passageway leading to the two-car garage has a flagstone floor and there is much glass brickwork in the rooms and passageways. The second floor contains a master bedroom with dressing room and dual bathroom, two other bedrooms, a sleeping porch, and another bath. Without making allowance for attic or exterior areas, the house contains 4,813 square feet. There is a recreation room in the basement with glass-brick bar. The exterior of the house is Pennsylvania fieldstone and the roof is slate. The cost to Raymond and Irma of the Haddonfield, N.J., residence which they sold in 1955 was not less than $42,500.

Alameda on its income tax return for 1955 reported no gain from the sale of the Finance Building. The disposition of the building is not reported except to the extent a disposition may be inferred from the listing of an amount under buildings and other depreciable assets in its balance sheet as of the beginning of the year and showing no assets at the close of the year.

On their joint income tax return for 1955, Raymond and Irma reported a long-term capital gain of $93,861.89 from the sale of 98 shares of Alameda stock. They did not report the sale of their personal residence on this return.

Respondent in his notice of deficiency to Alameda determined that it realized a long-term capital gain on the sale of the Finance Building of $124,021.76 and increased its reported income in accordance with this determination.

Respondent increased the income of Raymond and Irma as reported on their income tax return for 1955 by $122,873.62 designated as dividends and explained this adjustment as being withdrawals from Alameda determined to constitute constructive dividends.

Respondent also determined that Raymond and Irma realized a long-term capital gain on the sale of their Haddonfield residence of $7,758.10 (taxable at 50 percent) arrived at by deducting from the sales price of $42,500, selling expense of $251.90 and cost of residence and improvements of $34,490.

OPINION

Petitioners take the position that under section 337 [3] no gain should be recognized to Alameda from the sale of the Finance Building. Under section 337 if a corporation adopts a plan of complete liquidation and within a 12-month period beginning on the date of the adoption of such plan all its assets are distributed, no gain or loss is recognized from the sale of the corporate property within such 12-month period.

Petitioners in the instant case contend that Alameda adopted a plan of complete liquidation on October 6, 1955 (or between September 30 and October 6, 1955), and that by December 31, 1955 (or at least by April 1956), all of Alameda's assets had been distributed in complete liquidation. If these contentions of petitioners are sustained, it follows that the gain on the sale of the Finance Building is not recognized to Alameda since the agreed facts show that the contract to sell the building was entered into on October 6, 1955, and the deed to the building was delivered on November 1, 1955.

Respondent contends that Alameda adopted no plan of complete liquidation prior to the sale of the Finance Building. Respondent makes no contention that if such plan were adopted prior to the sale of the Finance Building, there was nevertheless no distribution of

---

[3] SEC. 337(a) GENERAL RULE.—If—

    (1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and
    (2) within the 12-month period beginning on the date of the adoption of such plan,

all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period.

Alameda's assets within the 12-month period after the adoption of such plan. Respondent stresses the facts that Alameda never adopted a formal plan of liquidation and was not dissolved prior to revocation of its charter in 1959 for nonpayment of franchise taxes as indicating that no plan of liquidation was adopted prior to sale of the Finance Building.

Section 337 was enacted to eliminate the problem of determining whether the sale of an asset of a corporation in the process of complete liquidation was by the corporation or by its shareholders who had received it as a distribution in liquidation. See *City Bank of Washington*, 38 T.C. 713, 721 (1962). As we pointed out in *Mountain Water Co. of La Crescenta*, 35 T.C. 418, 425 (1960), there is no statutory definition of the words "date of adoption of such plan" (of complete liquidation) used in section 337. The words "plan of liquidation" are also found in a number of sections of the Internal Revenue Code of 1939 and have been interpreted in many judicial decisions. It is clear from the cases that the adoption of a plan of liquidation does not require the adoption of a formal resolution of liquidation by the directors or stockholders. Whether such a plan has been adopted, and if so when, is a question of fact in each case. *Mountain Water Co. of La Crescenta, supra*, and *W. E. Guild*, 19 B.T.A. 1186 (1930).

The facts of the instant case show that after receiving an offer for the purchase of the Finance Building, but being unable to persuade the offeror to buy the Alameda stock instead, Raymond and Irma (the sole stockholders and directors of Alameda) decided to accept the offer and take the money received by Alameda from the sale of the building for their own use. The facts show that this decision was made on or shortly prior to October 6, 1955, when Alameda entered into the contract to sell the Finance Building. The facts further show that the Finance Building was Alameda's only operating asset. After Alameda sold the Finance Building, its only asset other than debts due it by Raymond and Irma, was money and Raymond and Irma withdrew this money for their personal use as they planned to do when they agreed to have Alameda sell the building. These facts show a plan of liquidation and distribution of assets. We consider the plan for and the subsequent liquidation to be a complete liquidation. The liquidation of a corporation was defined in *T. T. Word Supply Co.*, 41 B.T.A. 965, 980 (1940), as follows:

The liquidation of a corporation is the process of winding up its affairs by realizing upon its assets, paying its debts, and appropriating the amount of its profit and loss. It differs from normal operation for current profit in that it ordinarily results in the winding up of the corporation's affairs, and there must be a manifest intention to liquidate, a continuing purpose to terminate its affairs and dissolve the corporation, and its activities must be directed and confined thereto. A mere declaration is not enough, and the question whether a corporation is in liquidation is one of fact. * * *

On October 6, 1955, Raymond and Irma had an intention to terminate Alameda's normal business activities, to liquidate its assets, and to distribute the proceeds to themselves as its stockholders.

No business other than that having to do with the distribution of its assets was transacted by Alameda after October 6, 1955. Alameda filed an income tax return in April 1956 marked "Final Return" which showed no assets or liabilities, and a distribution of all its assets to its stockholders. Raymond and Irma filed a return for the taxable year 1955 in which they reported long-term gain on the sale of 98 shares of Alameda. All the actions of Raymond and Irma are consistent with a plan of complete liquidation for Alameda followed by such a liquidation. The fact that no formal resolution of dissolution was adopted but rather Alameda paid no further franchise taxes and let its charter be revoked by the State of New Jersey on February 2, 1959, for nonpayment of franchise taxes is not inconsistent with such a plan. Cf. *Kennemer* v. *Commissioner*, 96 F. 2d 177 (C.A. 5, 1938), affirming 35 B.T.A. 415 (1937). Raymond and Irma both testified in effect that their plan was for complete liquidation of Alameda when Alameda entered the contract of sale of the Finance Building on October 6, 1955. Their testimony as to their plan is supported by their actions and the other surrounding facts. Raymond and Irma were the sole stockholders and directors of Alameda. Their decision was the decision of Alameda. Being husband and wife they discussed Alameda's business without holding formal meetings or preparing minutes except when needed for some specific purpose.

Respondent points to the continued payment of real estate license fees and country club dues in New Jersey as indicating that Raymond and Irma were uncertain about returning to New Jersey and reactivating Alameda. In the light of the substantial evidence to the contrary, no such inference is warranted from these facts.

On the basis of all the evidence of record, we hold that within the meaning of section 337 a plan of complete liquidation was adopted for Alameda not earlier than September 30, 1955, nor later than October 6, 1955, and that within the following 12 months all of Alameda's assets were distributed in complete liquidation.

Our holding that a plan of complete liquidation was adopted and all of the assets of the corporation were distributed pursuant to the plan disposes of the second issue in this case. The distributions to Raymond and Irma were distributions in complete liquidation within the meaning of section 331 of the Internal Revenue Code of 1954.

The final issue is whether Raymond and Irma realized a capital gain from the sale of their personal residence in 1955. They sold their home in Haddonfield, N.J., in that year. Respondent determined that Raymond and Irma had a cost basis in the house and improvements thereto of $34,490.

Raymond and Irma each testified that the house cost them between $60,000 and $65,000 to build in 1946 plus the cost of two lots of land, one of which cost $2,500. The absence of documentary costs records was explained in their testimony. Respondent's agent testified to some difficulty in obtaining certain records from Raymond and Irma. However, in his very precise testimony, the only specific reference to records of the cost of the Haddonfield residence is at a conference in July 1959, which date is subsequent to the date these records were destroyed. This agent testified that at the time he first contacted Raymond and Irma, they told him of the sale of their residence in 1955.

Raymond and Irma introduced into evidence plans and photographs of the house to demonstrate the high quality of its construction. They produced the testimony of an expert witness who had examined the house in 1963 and after comparing the house examined to the architectural plans drawn for its construction gave as his opinion an estimated cost of construction in 1946 of about $55,000.

Respondent relies entirely upon the presumptive correctness that accompanies his determination. He introduced no evidence to show how his cost basis of $34,490 was reached. Respondent contends that little weight should attach to the testimony of Raymond and Irma and to that of petitioners' expert witness. Respondent also argues that an inference should be drawn that if the records of the cost of construction of the home were available they would not support petitioners' contention since the destruction of the cost records in 1958 took place after Raymond and Irma had ample warning of the importance of the records by respondent's agents. We consider that petitioners have satisfactorily explained the destruction of the cost records of the Haddonfield house. We conclude and have found as a fact that the Haddonfield residence and improvements thereto had a cost basis to Raymond and Irma of not less than $42,500 and that petitioners realized no taxable gain on the sale of this property in 1955.

*Decision will be entered under Rule 50.*