Nathan **MANILOW**, Transferee of Assets of Will-Cook Corporation and Park Forest Water Company, Plaintiff,

v.

**UNITED STATES of America,
Defendant.**

Nos. 68 C 2114 to 68 C 2128.

United States District Court,
N. D. Illinois, E. D.

July 17, 1970.

---

Lester Reinwald, Charles Melvoin, Chicago, Ill., for plaintiff.

James R. Thompson, U. S. Atty., for defendant.

## DECISION ON THE MERITS

ROBSON, Chief Judge.

This action (the Manilow case) is brought for recovery of $142,581.79 in income tax and $43,839.24 in interest paid by the plaintiff, Nathan Manilow, as an ultimate transferee of the Park Forest Water Company (Water Company) with respect to the federal income tax liability of the Water Company for the year 1958. Fourteen other suits (68 C 2115 through 68 C 2128) arising out of the same transaction and presenting identical questions of law have been consolidated for decision with the Manilow case. The related cases involve an aggregate of $174,266.64 in income tax and $53,580.90 in interest. The result in the Manilow case controls the outcome of the fourteen related cases. The court has jurisdiction over all these cases pursuant to 28 U.S.C. § 1346(a) (1).

Agreed stipulations of fact have been submitted by the parties in each of the fifteen suits. The first seven paragraphs of each stipulation recite the individual particulars of that suit. The remaining paragraphs are set forth only in the Manilow stipulation, but are adopted by the parties in the fourteen related cases. The parties have submitted briefs on the legal issues arising out of the undisputed facts. For the reasons set forth below, this court is of the opinion that judgment should be rendered for the plaintiff in each respective suit.

### THE STIPULATED FACTS

The residential community of Park Forest, Illinois, in the southern environs of Chicago, was planned and developed by American Community Builders, Inc. (ACB) and its wholly-owned subsidiaries. The plaintiffs in these cases were stockholders (or their successors in interest) of ACB in 1958 when the tax assessment in question was made against the Water Company. Incorporated under Illinois law in 1947, the Water Com-

pany was the wholly-owned subsidiary of ACB which constructed and operated a water supply system for Park Forest and the surrounding communities. The initial cost of the water supply system was $1,250,000. The Water Company was a public utility. As such, it was subject to the rules and regulations of the Illinois Commerce Commission, and operated under a Certificate of Convenience and Necessity granted by that agency in 1947.

During the period of affiliation between ACB and the Water Company, these corporations filed consolidated income tax returns. Initially, the Water Company serviced other affiliates of ACB. Sales of water, with a few exceptions, were made to ten of the members of the affiliated group, and billings were accomplished with monthly intercompany journal entries.

By 1953, ACB and its wholly-owned subsidiaries had constructed a commercial development, 3,100 rental units, and a number of residential units in Park Forest. ACB planned to construct more than 4,000 additional homes. The number of water customers had grown from ten affiliated companies and a few stores, at the time operations commenced, to more than 1,700 customers. The Water Company, with a continually expanding customer list, required specialized personnel for meter reading, meter billings, customer relations, water service, and, generally, the rendition of all types of service attendant upon the operation of a public utility. As the operations of ACB and its subsidiaries expanded and the population of Park Forest increased, it was decided to distribute the stock of the Water Company (then held solely by ACB) and to separate the Water Company from the affiliated group. Consequently, in 1953 the Water Company amended its certificate of incorporation to authorize the issuance of 25,000 shares of $100 par value common stock; 22,789 such shares were actually issued.

At that time, the Water Company was separated from the other ACB affiliates. ACB transferred the 22,789 shares of the Water Company's common stock to Will-Cook Corporation (Will-Cook), another wholly-owned subsidiary of ACB created solely for the purpose of holding the Water Company's stock. This procedure was required under the Internal Revenue Code of 1939 to qualify for treatment as a tax-free reorganization.[1] In exchange, ACB received 50,000 shares of Will-Cook's $1 par value common stock. ACB immediately distributed the 50,000 shares of Will-Cook stock on a *pro rata* basis to its own shareholders. As a result of this transaction, the then shareholders of ACB held *pro rata* interests in Will-Cook, which in turn owned all of the stock of the Water Company. The Internal Revenue Service ruled in 1953 that the foregoing transaction constituted a tax-free reorganization or "spin-off" under Section 112(g) (1) (D) of the Internal Revenue Code of 1939. At all times, Will-Cook's sole function has been to hold the stock of the Water Company. Will-Cook has never applied for a certificate of Convenience and Necessity, and has never functioned as a public utility.

By 1957, the population and water consumption of Park Forest had substantially increased. The Village of Park Forest indicated its willingness to acquire the facilities of the Water Company for public ownership. On July 15,

---

1. Section 112(g) (1) of the 1939 Internal Revenue Code, provides in part as follows:

"The term 'reorganization' means * * * (D) a *transfer by a corporation* of all or a part of its assets *to another corporation* if immediately after the transfer the transferor *or its shareholders* or both are in control of the corporation to which the assets are transferred * * *."

(Emphasis supplied.) This formalistic approach was abandoned in the Internal Revenue Code of 1954. Section 355 of that legislation provides that the stock of a controlled corporation may be distributed directly by the parent to its shareholders without adverse tax effects. 26 U.S.C. § 355; Commissioner of Internal Revenue v. Wilson, 353 F.2d 184, 186 (9th Cir. 1965).

1957, the board of directors of Will-Cook held a special meeting. The board recommended to the shareholders of Will-Cook that the affairs of that corporation be wound up, that the corporation be liquidated, and that its assets be distributed within 12 months in cancellation of the outstanding shares. The board further recommended that the officers of Will-Cook advise the officers of the Water Company to initiate a plan for complete liquidation within 12 months, which was to include the selling of the Water Company's assets and the distribution of the proceeds to Will-Cook. The shareholders of Will-Cook approved the board's recommendations that same day.

Also on July 15, 1957, the board of directors of the Water Company held a special meeting to consider the action taken by Will-Cook earlier that same day. The sole shareholder of the Water Company, i. e., Will-Cook, then approved the recommendation to wind up the affairs of the Water Company, to liquidate that company, to sell its assets and to distribute the proceeds to Will-Cook in cancellation of the outstanding shares within 12 months.

On August 8, 1957, the Village of Park Forest contracted to purchase the operating assets of the Water Company. The sale was approved by the board of directors of the Water Company one month later. On January 23, 1958, the Water Company conveyed its operating assets to the Village of Park Forest, and received $3,500,000 therefor.[2] The Water Company, in turn, caused two checks totaling that amount to be issued to Will-Cook. Will-Cook then issued checks in that amount to its stockholders, the plaintiffs herein, as a step toward its own complete liquidation. The Illinois Commerce Commission, acting at the request of the Water Company, canceled its Certificate of Convenience and Necessity on May 26, 1958. Prior to June 20, 1958, both the Water Company and Will-Cook had transferred all remaining assets to their respective shareholders pursuant to the plans of liquidation adopted in July, 1957. Both the Water Company and Will-Cook were dissolved under Illinois law on June 20, 1958.

## THE TAX ASSESSMENT IN ISSUE

The plaintiffs, as shareholders of Will-Cook, were taxed upon the proceeds distributed to Will-Cook by reason of the sale of the Water Company's assets in 1958.[3] The plaintiffs were later subjected to a second tax based upon the gain realized by the Water Company arising from the identical transaction. The Internal Revenue Service refused to treat the Water Company's liquidation as a nontaxable event to that corporation on the ground that, as a wholly-owned subsidiary of Will-Cook, it was not eligible for tax-free liquidation treatment under Section 337(a) of the Internal Revenue Code of 1954, by operation of Sections 337(c) (2) and 332.[4]

On March 5, 1964, the Internal Revenue Service determined that the Water Company had an income tax deficiency of $316,848.43 for the year 1958.[5] The

2. This amount was paid by two checks: on January 23, 1958, the Village issued a $3,400,000 check to the Water Company; on March 5, 1958, a check for the remaining $100,000 was issued.

3. As previously described, these proceeds were immediately distributed by Will-Cook to the plaintiffs in furtherance of of liquidation of Will-Cook contemporaneously with the liquidation of the Water Company.

4. These provisions, discussed in detail, *infra*, generally render a subsidiary taxa-

ble for gains realized upon its liquidation if 80% or more of its stock is owned by the parent for more than two years prior to the liquidation.

5. The Internal Revenue Service determined the following adjustments to the Water Company's 1958 corporate income tax return:

Additional income and unallowable deductions:

| | |
|---|---|
| Depreciation | $ 7,547.34 |
| Short term capital gain | 17,438.07 |
| Long term capital gain | 1,229,089.14 |

The parties have stipulated that the Water Company is entitled to a deduction for

Water Company, liquidated in 1958, could not satisfy this liability. Furthermore, the Water Company's immediate transferee, Will-Cook, had simultaneously been liquidated. Plaintiffs were in turn the transferees of the assets of Will-Cook. Accordingly, they were assessed for the Water Company's tax liability on a *pro rata* basis. Interest was also assessed. All plaintiffs satisfied this second liability in 1964. However, in 1966, plaintiffs filed timely claims for refund of the taxes and interest arising out of the second assessment. In 1967, plaintiffs were notified that their claims were disallowed. These suits were filed as a consequence.

## TAX CONSEQUENCES OF SECTION 337(a) LIQUIDATIONS

Prior to enactment of Section 337(a) as a part of the Internal Revenue Code of 1954, ambiguous standards were applied to determine whether a corporation or only its shareholders were liable for gains realized upon complete liquidation. In Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S. Ct. 707, 89 L.Ed. 981 (1945), the Supreme Court held that if the liquidating corporation sold the assets, the corporation as well as the shareholders were taxable for any gains realized. However, five years later the Supreme Court held that if the corporation distributed the assets in liquidation, and the assets were then sold by the shareholders, there was only one tax at the shareholder level. United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950). In cases where a corporation was closely held, so that its officers and shareholders

might well be the same persons, serious difficulties arose in determining whether it was the shareholders or the corporation which actually negotiated the sale. Disparate tax consequences flowed from this difficult determination, and the technical method used in executing a given liquidation controlled. See United States v. Morton, 387 F.2d 441, 444 (8th Cir. 1968).

Congress enacted Section 337 as a remedial provision to eliminate double taxation by imposing only one tax at the shareholder level upon gains resulting from a complete corporate liquidation. The House and Senate Reports concerning this provision manifest a clear intent to eliminate the technicalities found to be of significance by the courts as the basis for taxing both the corporation and the shareholders or just the shareholders for substantially the same transaction. The House Report noted that

"* * * under present law, the tax consequences arising from sales made in the course of liquidation depend primarily upon the formal manner in which transactions are arranged. *The possibility that double taxation may occur in such cases results in causing the problem to be a trap for the unwary.*" 3 U.S.Cong. & Admin.News, p. 4244 (1954). (Emphasis added.)

Section 337(a) sets forth two criteria for liquidations which are exempt from taxation at the corporate level. The corporation must adopt a plan of complete liquidation,[6] and further, it must completely liquidate within a 12-month period.[7] Compliance with these two requirements renders a corporation exempt from taxation upon any gain realized on the sale or exchange of the liqui-

---

depreciation in the amount of $3,773.67, as against the zero deduction determined by the Internal Revenue Service. Manilow Stipulation, paragraph 41.

6. Adoption of the plan of liquidation need not be formal. *E. g.*, Alameda Realty Corporation v. Commissioner of Internal Revenue, 42 T.C. 273 (1964).

7. The 12-month requirement has also been liberally interpreted to protect shareholders from double taxation. *E. g.*, Bird Management, Inc. v. Commissioner of Internal Revenue, 48 T.C. 586 (1967). *But see* United States v. Morton, *supra*.

dated corporation's assets within the 12-month period. It is undisputed that the Water Company adopted a plan of complete liquidation in July, 1957, that the sale which gave rise to the gain in question occurred within the following 12-month period, and that the Water Company completely liquidated within the 12-month period. Therefore, absent an applicable exception to Section 337(a), the Water Company was exempt from taxation for the gain realized upon the sale of its assets to Park Forest.

## THE PARENT-SUBSIDIARY EXCEPTION

It is undisputed that Will-Cook held 100% of the Water Company's stock, and that the Water Company's liquidation occurred more than two years after Will-Cook acquired its stock. The defendant contends that these facts alone render Section 337(a) inapplicable to the transaction in question.

The following maze of provisions are offered in support of the defendant's position. Section 337(c) (2) provides that if Section 332 is applicable to a liquidation, and if Section 334(b) (1) is also applicable, then Section 337(a) is inapplicable to that liquidation. Section 332 is applicable to the complete liquidation of a subsidiary if a minimum of 80% of its shares are owned by the parent, and if the subsidiary distributes all of its assets in complete cancellation of its shares within the taxable year. Section 334(b) (1) applies to a Section 332 liquidation if Section 334(b) (2) does not apply. In no event does Section 334(b) (2) apply if the plan of liquidation is adopted more than two years after the parent acquires the subsidiary's shares.

The interaction of these provisions presumes that the liquidating corporation is distributing its assets to a viable, operating business entity, i.e., the parent. The corporate income tax is aimed primarily at the profits of a going con-

cern. The relationship between Will-Cook and the Water Company was hardly that of a corporate parent and subsidiary in any functional sense. Will-Cook was the inert, obsolete creature of the Internal Revenue Code of 1939. It was created and existed only for the purpose of effectuating a reorganization. By law ACB could not transfer its shares in the Water Company directly to its own shareholders without incurring adverse tax consequences in 1953. Will-Cook was thus created to hold the Water Company's shares for the benefit of ACB's shareholders. As noted above, this formality was abandoned in the Internal Revenue Code of 1954. It is uncontroverted that Will-Cook did not carry on any trade or business, that it had no income, nor did it have any business purpose after enactment of the Internal Revenue Code of 1954. Its sole function was to hold the stock of the Water Company for the plaintiffs. Upon liquidation of the Water Company, Will-Cook was merely the conduit through which the proceeds of the sale of its assets were distributed to the plaintiffs. Under these circumstances, Will-Cook should be disregarded as a separate entity for tax purposes. *See* 7 Mertens, Law of Federal Income Taxation § 38.12 (1967), and cases cited therein.

Even assuming a parent-subsidiary relationship between Will-Cook and the Water Company, the simultaneous liquidation of these two corporations raises serious questions about the applicability of the provisions asserted by the defendant. Those provisions were enacted to tax a going concern, i.e., the corporate parent, thereby preventing tax avoidance by intercorporate manipulation. Without Section 337(c) (2), the normal Section 337(a) liquidation of a subsidiary into a parent actively engaged in trade or business would result in a loss of tax revenue to the Treasury. Gain arising from the sale of corporate property under such circumstances would be recognized by neither parent nor subsidiary. *See* Bittker and Eustice, Federal Income

Taxation of Corporations and Shareholders 407 (1966 ed.).

The transaction in question substantially deviates from a "normal" Section 337(c)(2) parent-subsidiary liquidation. The gain realized was channeled directly and immediately to the plaintiffs, who in turn recognized their consequent tax liability at the shareholder level. To levy a double tax upon the plaintiffs because of the *form* and not the substance of the liquidation of the Water Company would be to ignore the express legislative intent of Congress. The approach advocated by the defendant traps the plaintiffs into double taxation because of the form they unwarily took in effectuating a complete corporate liquidation. As articulated by Justice Hugo Black in United States v. Cumberland Public Service Co., *supra*, it is for the trial court, upon consideration of the entire transaction, including motives, intent, and conduct, to determine the factual category under the tax laws in which a particular transaction belongs.

Upon the record before this court, Will-Cook should be disregarded as a corporate entity in determining the tax consequences of the transaction in issue. The liquidation of the Water Company in substance must be viewed as a direct distribution of the proceeds from the sale of its assets to the plaintiffs. The assessment against the Water Company, and derivatively against these plaintiffs, for gains realized upon its complete liquidation was therefore erroneous under Section 337(a).

### ORDERS

It is therefore ordered that judgment be, and it is hereby rendered for the plaintiff in each respective case herein.

It is further ordered that the plaintiffs compute the refund and interest to which each of them is entitled, consistent with the court's decision. The plaintiffs in each case herein are directed to prepare judgment orders accordingly, and to present such orders for the court's approval within 60 days.