SHAW CONSTRUCTION COMPANY,
Petitioner,

v.

COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.

No. 18034.

United States Court of Appeals
Ninth Circuit.

Sept. 20, 1963.

Ernest R. Mortenson and Eugene Har-
pole, Pasadena, Cal., for petitioner.

Louis F. Oberdorfer, Asst. Atty. Gen.,
Lee A. Jackson, Harry Baum, and Har-
old C. Wilkenfeld, Attys., Dept. of Jus-
tice, Washington, D. C., for respondent.

Before BARNES and JERTBERG,
Circuit Judges, and SWEIGERT, Dis-
trict Judge.

SWEIGERT, District Judge.

This is a petition of Shaw Construction Company, a corporate taxpayer, for review of the decision of the Tax Court, entered March 20, 1963, concerning federal income and excess profits taxes for fiscal years ending March 31, 1952 and March 31, 1953.

Jurisdiction is conferred on this Court by Sec. 7482, Internal Revenue Code of 1954.

The question presented is whether the Tax Court erred in holding that certain income earned from the development of real estate by construction and sale of houses thereon was taxable to petitioner under Sec. 22(a), Internal Revenue Code of 1939, rather than to certain other multiple corporations hereinafter referred to.

The evidence in the record before the Tax Court shows and the Tax Court found the facts to be substantially as follows:

Shaw Construction Company, the petitioner, was incorporated in April, 1946. All of its outstanding capital stock (10,000 shares at $1 par value each) has at all time been owned in equal parts by Harold L. Shaw and his wife, Martha J. Shaw. Since incorporation, Harold L. Shaw and Martha J. Shaw have served as president and secretary-treasurer, respectively. From December 15, 1949, and through 1958, John Moore Robinson, Shaw's attorney, was vice-president. The Shaws and Robinson were the sole directors of the company during that period.

Petitioner was a licensed general contractor in the State of California and was engaged in the business of general contracting and construction of single family residences.

In 1950, petitioner began to enter into construction contracts with other corporations (hereinafter referred to as the multiple corporations) for the building of single family residences on various tracts for ultimate sale to war veterans. These multiple corporations consisted of 88 corporations and three trusts and one partnership. The corporations had been organized between January 29, 1949 and January 11, 1952, except three of them which had been organized earlier, 1927, 1937 and 1948.

Harold L. and Martha J. Shaw were the original stockholders and owners of from 79% to 100% of the 100 share-$1 par value, capital stock in 78 of these multiple corporations and had a similarly great interest in the remaining ten corporations.

Harold L. and Martha J. Shaw, with J. M. Robinson, the Shaw attorney, served as president, secretary-treasurer and vice-president respectively, and were the sole directors of 85 of the 88 corporations and J. M. Robinson, the attorney, with two other individuals, served as officers and directors of the remaining three corporations.

Under its construction contracts with these multiple corporations, petitioner, Shaw Construction Company, constructed 502 houses during its fiscal year ending March 31, 1952 and 1221 houses during its fiscal year ending March 31, 1953 on 13 separate tracts of land the record to which was held by one or more of these multiple corporations.

Harold L. Shaw had been engaged in the construction business in the Los Angeles area since 1922 and in the development of subdivisions or tracts since 1941. Acting on behalf of Shaw Construction Company, he was the prime mover in the acquisition and development of the tracts involved. Although details varied, a general pattern was followed with respect to the acquisition of land, the construction of houses, and the ultimate sale of the improved lots.

Shaw would select the land, investigate its suitability for development, contact the owners of the land, negotiate its purchase and make arrangements for the financing of the purchase. The purchase transactions involved either cash or a note to the seller secured by a deed of trust subordinated to a construction loan, or a combination of the two. Most commonly the sellers took little or no cash

and received a note secured by a deed of trust which, under the terms of an escrow agreement, would be paid off from the proceeds from the sale of the completed houses. When any cash was involved it was in most cases advanced by Shaw or Shaw Construction Company.

Originally, legal title to the tracts would be taken in the name of Shaw individually (with his wife), Shaw Construction Company, or one of the multiple corporations. Tracts to which Shaw or Shaw Construction Company would initially take title were in almost all cases subsequently divided up and transferred to one of the multiple corporations at cost prior to the commencement of construction or sale to the ultimate purchaser. Shaw would determine which entities would be involved and the number of lots in each tract that they would receive.

Shortly after the various corporations took title to groups of lots in the tracts, they executed substantially identical construction contracts with Shaw Construction Company.

In order to qualify for Veterans Administration insurance on the ultimate "takeout" loans, it was necessary to obtain a Veterans Administration master certificate of "reasonable value" for each tract to be developed. These certificates were issued by the Veterans Administration either in the name of Harold L. Shaw or in the name of Shaw Construction Company.

Approval for the development of the tracts was also required by the Regional Planning Commission and the Division of Real Estate of the State of California. This was obtained upon application made by either Shaw or Shaw Construction Company.

Having received the necessary governmental approval Shaw, acting individually or for the Shaw Construction Company, arranged for the procurement of interim construction loans. All these construction loans were obtained from one of two Los Angeles Savings and Loan Associations and totaled $12,988,000.

These loans were made in name to the various multiple corporations which happened to hold title to the land for which the construction funds were designated and generally did not exceed $100,000 to any one entity. The various multiple corporations signed the notes and deeds of trust.

However, the lending institutions negotiated the loans with Shaw, considered the projects as "Shaw tracts," requested and received Shaw's personal financial statement, which indicated a net worth in excess of $600,000, and looked to Shaw and Shaw Construction Company for payment of the loan obligations. Shaw, or Shaw Construction Company guaranteed to the lenders the completion of all houses in accordance with the filed plans and specifications and that all labor and material used in the performance of the construction contracts would be paid for.

At the time each loan was consummated with the appropriate corporate owner, the proceeds of the loans were immediately assigned to Shaw Construction Company as general contractor for its disbursement.

The completed houses were ultimately sold by independent real estate brokers, who usually were employed by and provided with "selling tract offices" by and on the properties of Shaw Construction Company. The payment of their commissions was usually authorized by Shaw Construction Company. With respect to the sales effort, the houses were advertised as "Shaw Planned" or "Shaw Built." No reference was made to the various corporate record owners of the properties.

When a sale was closed the proceeds would be applied through escrow to pay the outstanding amount due the original owner of the land, the construction loan, any outstanding balance due Shaw Construction Company under the construction contract, selling commissions and miscellaneous expenses, and the balance paid to the selling corporation.

Apart from the original capital—$100 each for 78 of the corporations and simi-

larly low capitalization for the remaining ten—the multiple corporations had no assets except those received in the course of these transactions.

During the period involved herein the offices of the multiple corporations were the same offices rented and occupied by Shaw Construction Company and they had no independent telephone number or listing. The multiple corporations had no employees and no payroll. Their books and records were maintained by employees of Shaw Construction Company. As a general practice, all rent and other administrative expenses were paid for by Shaw Construction Company.

The only evidence of any activities on the part of the multiple corporations as such are minutes of directors and stockholders meetings, wherein Shaw, acting on behalf of the multiple corporations, agreed to enter into a contract submitted by Shaw acting in behalf of Shaw Construction Company for construction of houses at a fixed price, or for the purchase of lots from Shaw, and the signing of papers by Shaw in behalf of the multiple corporations in connection with loans and the final sale of completed lots.

The only capital the multiples could use to produce income was the meager original capital put up for the most part by Shaw and funds borrowed on the strength of Shaw's guarantee and the construction know-how of Shaw Construction Company.

The Shaw Construction Company through its officers and stockholders, had absolute control of the division and distribution of all income and profits received by Shaw, Shaw Construction Company and the Shaw-controlled multiples from the development and sale of these properties. The Shaws owned most of the stock in all of the corporations and could do as they pleased with any of them after the construction loans and the former owners were paid off. Shaw could fix the construction contract price between the multiples and Shaw Construction Company to divide the profits in any way he wanted. In fact, the majority of the profit went to multiple corpora-

tions, whose total income could be limited by the number of lots they owned, and none of them reported a net income of over $25,000, while Shaw Construction Company which built the houses and undertook all construction risks earned an average profit of only $25 on each of the houses constructed. This of course permitted its net income to remain below the surtax brackets.

The Tax Court found from the evidence that the multiple corporations organized by Shaw were not organized for any substantial business purpose but were organized primarily to obtain tax benefits; that they did not perform the business activities which created the income from the development and sale of real estate, nor any substantial business activity that created income, and consequently did not earn the income in question; that those corporations, though legal in form, were unreal and sham and are to be disregarded for tax purposes; that Shaw Construction Company earned the income from these real estate projects and, the Tax Court concluded, is taxable thereon.

Assuming these findings to have substantial support in the record, the conclusion of the Tax Court is correct.

Although taxpayers have the right to mold their business transactions in such a manner as to minimize the incidence of taxation, United States v. Cumberland Pub. Serv. Co., 338 U.S. 451, 70 S.Ct. 88, 94 L.Ed. 518 (1949), the government is not required to acquiesce in the form chosen by taxpayers for doing business and, if the form is unreal and sham, the fiction may be disregarded for purposes of the tax statutes. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1934), Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L. Ed. 406 (1939). The incidence of taxation depends on the substance of the transaction, Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1944), and, as pointed out by Judge Learned Hand in National Investors Corp. v. Hoey, 144 F.2d 466, 468 (2d Cir., 1944): "[T]o be a separate jural

person for purposes of taxation, a corporation must engage in some industrial, commercial, or other activity besides avoiding taxation: in other words, * * the term 'corporation' will be interpeted to mean a corporation which does some 'business' in the ordinary meaning; * * escaping taxation is not 'business' in the ordinary meaning."

■ To be afforded recognition for tax purposes a taxpayer "must be a viable business entity, that is, it must have been formed for a substantial business purpose or actually engage in substantive business activity." Aldon Homes, Inc., 33 T.C. 582, 597 (1959).

■ It is well settled that the dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it and enjoy the benefit of it when paid. Helvering v. Horst, 311 U.S. 112, 119, 61 S.Ct. 144, 148, 85 L.Ed. 75 (1940). See also, Haberman Farms v. United States, 305 F.2d 787 (8th Cir., 1962); Jackson v. C. I. R., 233 F.2d 289 (2d Cir., 1956).

Petitioner states in its briefs that it is not concerned with whether the multiple corporations were unreal or shams and that it neither attempts to support nor to attack the Tax Court's finding that they were shams.

Conceding that income may be taxed to the one who earns the income, petitioner limits itself to the argument—"the sum and substance of the case now before the court"—that the one who earns income from property must necessarily be the one who owns the property—in this case the various multiple corporations which held legal title to the lots or tracts in question.

Pointing out that the tax court did not find that Shaw Construction Company owned the tracts, lots and houses in question, but merely found that the various multiple corporations, which held the legal title thereto, were unreal shams, petitioner argues that this does not amount to a finding that Shaw Construction Company was the owner thereof and that, therefore, the latter has been im-

properly taxed for the income produced by the property.

This line or argument assumes, however, that legal title to property forecloses a finding that the income from the property was in fact earned, not by such legal owner of the property, but by another—in this case Shaw Construction Company as specifically found by the Tax Court.

■ Taxpayer's argument is fallacious and finds no support in either statutory or case law. In the tax sense, bare legal title and real ownership are not necessarily synonymous. Underlying the cases is the principle that legal formalisms with which a transaction may be surrounded are not controlling, but that the tax consequences must be based upon the substance and reality of the transaction viewed as a whole.

Thus, in James Realty Co. v. United States, 280 F.2d 394 (8th Cir., 1960), where the taxpayer, a corporation similarly engaged in the homebuilding business, had been formed for the principal purpose of tax avoidance by a person who had organized other similar corporations, the Court affirmed the disallowance of a claimed deduction under the corporate surtax exemption (26 U.S.C. § 15 (b)) and the minimum excess profits tax credit (26 U.S.C. § 431). See also Aldon Homes Inc., supra.

This principle has been applied to other attempts at various income splitting devices, e. g., anticipatory assignments of income to family members (Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1929); Helvering v. Horst, supra; Harrison v. Schaffner, 312 U.S. 579, 61 S.Ct. 759, 85 L.Ed. 1055 (1940); family trusts (Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1939)); family partnerships (Commissioner v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670 (1945); Lusthaus v. Commissioner, 327 U.S. 293, 66 S.Ct. 539, 90 L. Ed. 679 (1945); Commissioner v. Culbertson, 337 U.S. 733, 69 S.Ct. 1210, 93 L.Ed. 1659 (1948); Alexander v. Commissioner, 194 F.2d 921 (5th Cir.,

1952)); shareholder-corporation arrangements (Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1934); Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319 (1939); Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1939); Moline v. Commissioner, 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1127 (1942); Commissioner v. Court Holding, supra).

Notwithstanding its statement that it neither attempts to support nor attack the Tax Court's finding that the multiple corporations were shams, petitioner did, nevertheless, argue before the Tax Court and at oral argument before this Court (but not in its briefs herein) that there were certain real business purposes for the creation and utilization of the multiple corporations, namely:

First, that the lending institutions which furnished the construction funds refused to lend more than $100,000 to any one corporate borrower and requested in certain letters written by them to Shaw that Shaw divide the properties among separate corporations in such manner that none of them would require a loan of more than $100,000.

This factual contention was considered and discussed by the Tax Court in its findings and opinion and, upon evidence that was in part conflicting and as a whole susceptible of different inferences, the Tax Court found that these letters were written at the request of Shaw and/or his attorney; that the idea of limiting the amounts of loans to any one borrower was conceived by Shaw or his attorney and not by the lending institutions and that the lending institutions were willing to lend the entire amounts actually loaned in lump sum to Shaw and Shaw Construction Company.

Upon this finding the Tax Court concluded that the scheme to split the loans was used by Shaw to justify the use of multiple corporations in these transactions rather than because of any business reasons except the tax benefits resulting therefrom.

Secondly, that the use of numerous corporations was to facilitate the handling of mechanics liens.

This factual contention was also considered, discussed and found by the Tax Court not to be a primary reason motivating the use of multiple corporations and that such use was motivated by the tax benefits to be derived therefrom and for no sound business purpose.

Third, that the multiple corporations, rather than Shaw Construction Company, earned a large part of the income through appreciation in the value of the land while they held it. Petitioner points to the fact that the Veterans Administration certificates of reasonable value placed values on the lots considerably in excess of the average price paid therefor.

The Tax Court disposed of this contention by pointing out that these certificates contemplated lots as developed and improved by the construction of houses; that, therefore, such certifications did not indicate mere natural increase in the value of the lot, and that any increment in lot value was due to the planned development and construction work to be done by Shaw Construction Company.

The issues in this case—whether the multiple corporations were unreal shams, serving no real business purpose and earning no income, and whether the income in question was in reality produced and earned, not by the multiple corporate holders of legal title, but by petitioner, Shaw Construction Company—are issues of fact. The findings and conclusions of the Tax Court are supported by substantial evidence and should not be disturbed.

Accordingly, the decision of the Tax Court is affirmed.