*Decision will be entered under Rule 155.*

HALEY BROTHERS CONSTRUCTION CORP., ESTATE OF JOHN W. HALEY, JOHN W. HALEY, JR., AND JOSEPH A. HALEY, EXECUTORS, AND MARY A. HALEY, ESTATE OF FRANCIS J. HALEY, BONNIE J. HALEY, EXECUTRIX, AND BONNIE J. HALEY, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8585-81.          Filed August 18, 1986.

*Benjamin G. Cox* and *B. Guille Cox, Jr.*, for the petitioners.

*Rodney J. Bartlett*, for the respondent.

CHABOT, *Judge*: Respondent determined a deficiency in Federal corporate income tax against Haley Bros. Construction Corp. for 1977 in the amount of $43,942.43. Respondent determined deficiencies in Federal individual income tax against John W. Haley and Mary A. Haley, and against Francis J. Haley and Bonnie J. Haley, for 1977 in the amounts of $5,617 and $1,962, respectively. After concessions by petitioners, the issue for decision is whether Haley Bros. Construction Corp.'s status as a subchapter S corporation under section 1371[1] terminated in 1977 when it acquired 100 percent of the stock of Marywood Corp. because Haley Bros. Construction Corp. became a member of an affiliated group.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the petition was filed in the instant case, Haley Bros. Construction Corp.'s (hereinafter sometimes referred to as HBC) principal place of business was located in Terre Haute, Indiana, and John and Mary Haley (husband and wife) and Francis and Bonnie Haley (husband and wife) resided in Terre Haute. After the petition was filed in the instant case, petitioners John Haley (hereinafter sometimes referred to as John) and Francis Haley (hereinafter sometimes referred to as Francis) died in February 1984, and in October 1982, respectively, and their estates were substituted as petitioners. John and Francis were brothers.

HBC was incorporated under Indiana law in 1956. During 1977, HBC was involved in the construction industry primarily with respect to heavy construction such as building bridges, grading railroad track beds, constructing large sewer lines, and erecting large shovels at coal mine sites. John, in addition to being one of the founders of HBC, was also its chairman and president. He conducted HBC's business as if it were his own business; that is, he made all

[1]Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the year in issue.

[2]With the exception of one income adjustment which John and Mary Haley conceded, if Haley Bros. Construction Corp.'s subchapter S corporation status was not terminated in 1977, then deficiencies determined against all petitioners will be eliminated.

the major decisions and told the board of directors the actions he intended to take. The board never refused to approve his actions.

From 1966 through 1976, HBC filed its income tax returns as a subchapter S corporation, pursuant to an election made under section 1371.[3] John and Francis, as the only shareholders, filed their income tax returns and paid their Federal income taxes therewith based on HBC's status as a subchapter S corporation.[4] Neither HBC nor its shareholders elected to terminate HBC's subchapter S corporation status for 1977. Petitioners timely filed their respective income tax returns for 1977 in accordance with their belief that HBC was a subchapter S corporation for 1977.

Marywood Corp. (hereinafter sometimes referred to as Marywood) was incorporated under Indiana law on February 7, 1962. In conformance with its organizational purpose, Marywood was involved in selling and developing real estate, including developing a tract of land known as the Marywood Subdivision. The Marywood Subdivision, located on the south side of Terre Haute consisted of about 68 acres comprising about 300 residential lots. At his death in 1971, Leonard Hirt, a friend of John's, was president and director of Marywood. In 1972, John was elected director of Marywood to fill the vacancy created by Leonard Hirt's death. John accepted the directorship because it came at the request of the Hirt family (who were the remaining shareholders of Marywood) and because he was familiar with the business. John served as a director of Marywood until HBC bought the Marywood stock in 1977, and for some time afterward.

From 1972 to 1977, Marywood actively developed and sold lots in the Marywood Subdivision and, using the construction services of HBC, built a sewer for the subdivision. The sewer construction was financed through loans from Merchants National Bank (hereinafter sometimes referred to as Merchants) and HBC. HBC also loaned money to Marywood to help make payments on a mortgage.

---

[3] So stipulated. HBC's 1977 tax return includes a statement that HBC's subchapter S election was made on "12-23-66". Under sec. 1372(c) (present law sec. 1362(c)), an election made on Dec. 23, 1966, would have first taken effect for 1967.

[4] During 1977, John owned 1,600 shares (80 percent) of the total outstanding stock of HBC and Francis owned the remaining 400 shares (20 percent).

From the time of Leonard Hirt's death until 1977, Marywood faced serious business problems and litigation; in 1977, it was approaching bankruptcy. Marywood was in arrears in its interest obligations to Merchants and was overdue on its debt to HBC. In addition, Marywood owed significant attorneys fees and insurance premiums, and was a defendant in a lawsuit. Because of Marywood's impending bankruptcy, its shareholders decided to sell the Marywood stock.[5] On June 18, 1977, John (on behalf of HBC) negotiated and executed an agreement with John Hirt (on behalf of the Marywood shareholders), pursuant to which HBC would pay each of the Marywood shareholders $10,115.28 and would assume all the Marywood obligations and liabilities; in exchange therefor, HBC would acquire all the Marywood stock and receive all the Marywood assets.

HBC had three reasons for buying the Marywood stock. First, John believed the sewer system could be sold to the Sanitary District. Second, since Marywood was heavily indebted to HBC, the sale of the sewer system and the completion of the development of the subdivision as commercial land would provide a means for HBC to recoup the debt owed to it by Marywood. Third, although HBC purchased the Marywood stock to acquire the Marywood assets, HBC chose to effect the transfer of the assets in the form of a stock acquisition because (1) the Marywood shareholders declined to sell the assets directly, (2) a direct sale of the assets would trigger the immediate repayment of a mortgage on certain assets, and (3) John believed that HBC would become involved in the litigation pending against Marywood if HBC acquired the assets rather than the stock of Marywood. The June 18, 1977, agreement was performed and HBC acquired all of the Marywood stock.[6]

After HBC acquired the Marywood stock, a number of events occurred with respect to Marywood's corporate affairs. The Marywood board of directors held a special meeting on June 18, 1977, pursuant to which the then

[5]John advised the Hirt family that it could sell the sewer system to the City of Terre Haute Sanitary District (hereinafter sometimes referred to as the Sanitary District), which under State law was required to buy the system, in order to raise money to meet Marywood's obligations. However, the Hirt family did not believe that the Sanitary District had to buy the sewer system, and did not agree to sell the system.

[6]So stipulated. No Marywood stock certificates were issued to HBC in connection with the June 18, 1977, agreement.

Marywood directors and officers (other than John) resigned and were replaced by representatives of HBC.

On February 1, 1978, HBC executed a proxy, appointing John to represent HBC and to vote all of its stock in Marywood at the 1978 annual meeting or, alternatively, to execute a written consent to resolutions of the Marywood shareholders in lieu of the annual meeting. Thereupon, John executed such a written consent naming the new directors of Marywood for a 1-year term and the directors of Marywood also formally consented to the resolution of the board of directors in lieu of the annual meeting of the board, naming the new officers of Marywood for a 1-year term.

On May 2, 1978, the Marywood board of directors, through a written consent to resolutions, consented to the sale of one of the Marywood Subdivision lots to John's son, John W. Haley, Jr. (hereinafter sometimes referred to as John, Jr.), for $36,800.[7] Thereupon, Marywood, as grantor, executed a corporate warranty deed to John, Jr., and his wife. Indiana Savings & Loan Association, John, Jr.'s mortgagee, paid $25,587.80 of the purchase price to Marywood in consummation of this sale.[8] This is the only residential real estate lot that Marywood sold after June 18, 1977.

On September 15, 1978, the Marywood board of directors held its quarterly meeting and discussed Marywood's financial status.

On November 22, 1978, as a result of respondent's examining agent's raising the issue of HBC's subchapter S corporation status, HBC held a special meeting of its board of directors in which it determined that Marywood would be liquidated and dissolved pursuant to State law. On that same date, Marywood's and HBC's boards of directors consented to Marywood's dissolution. On or about December 11, 1978, Marywood filed Form 966, Notice of Corporate Dissolution or Liquidation, with the Internal Revenue Service. On December 27, 1978, Marywood, as grantor, executed a Deed, Conveyance, and Bill of Sale transferring

---

[7] A house had been built on the lot by HBC for which HBC provided the funds.

[8] The May 2, 1978, consent was "for the sum of Thirty-Six Thousand Eight Hundred Dollars ($36,800.00) cash". The record in the instant case does not indicate how the remaining $11,212.20 was paid.

all its properties to HBC. Marywood then executed two confirming warranty deeds on February 9, 1979, with respect to real estate held by it, and caused the deeds to be filed on March 26, 1979, with the Vigo County, Indiana, Recorder's Office. Thereupon, on May 10, 1979, the Certificate of Dissolution of Marywood was filed with the Secretary of State of Indiana.

Marywood timely filed Federal and Indiana income tax returns for 1977 and 1978. On its 1977 Federal income tax return (filed August 18, 1978), Marywood reported interest income of $87.28, deductions of $15,435.84 comprising taxes, interest, and various office expenditures, a net operating loss of $15,348.56, and, thus, no tax liability for that year. On its 1978 Federal income tax return (filed March 19, 1979), Marywood did not show any gross income, taxable income, or tax liability, but rather stated that HBC acquired all the Marywood assets and liabilities and that HBC would report all transactions on its 1978 tax returns.

John never intended to have Marywood operate as an independent corporate venture once HBC acquired control of Marywood; he planned eventually to liquidate Marywood. Notwithstanding this intention, however, John chose not to dissolve Marywood formally in accordance with State law immediately upon acquisition of the stock because he first wanted to improve Marywood's financial condition before dissolving the corporation. John was concerned that to do otherwise would result in significant litigation being filed against him as well as causing the requirement of immediate repayment of certain debts.

Before HBC began the formal process of liquidating Marywood, HBC took steps to advise Marywood's creditors that bills would be paid and then, in fact, actually paid the bills shortly thereafter. Thus, after the acquisition of the Marywood stock, attorneys fees were paid, overdue interest on bank loans was paid, litigation was settled, the sewer system was sold to the Sanitary District, and an outstanding mortgage to Merchants was paid. Marywood did not have any taxable income during this period.[9] The proceeds

---

[9]Marywood's 1977 interest income ($87.28) was received before HBC acquired Marywood's stock. There is no evidence as to whether Marywood's 1977 expenses ($15,435.84) were paid or incurred before this acquisition. Marywood's 1977 tax return shows that Marywood did not have any taxable income in 1976, 1975, and 1974, as well as 1977.

from the sale of the real estate to John, Jr., were deposited in Marywood's checking account. Because the real estate was sold at cost, no gain from the sale was reported on HBC's tax return.

HBC chose to retain a checking account that had been maintained at Merchants in Marywood's name from the time of Marywood's incorporation in 1962.[10] After HBC acquired Marywood's stock, HBC deposited some of its funds into Marywood's checking account in order to pay the preacquisition Marywood debts described above, since the account did not have enough funds to pay these debts. John retained this Marywood checking account in order to assure Merchants, the mortgagee on the Marywood Subdivision mortgage, that Marywood was not going to default on its debt.

After June 18, 1977, not all of Marywood's preacquisition debts were paid directly from Marywood's checking account; rather, some were paid directly by HBC to Marywood's creditors. HBC's bookkeeper, who was in charge of Marywood's checking account after June 18, 1977, did not maintain complete books and records for Marywood as she did for HBC. Moreover, because Marywood's records were intermingled with HBC's records, she was unable to identify those transactions in which HBC paid Marywood's debts and those transactions in which Marywood's debts were paid through the Marywood checking account. In fact, the determination as to whether HBC would pay a preacquisition debt of Marywood or whether the debt would be paid through Marywood's checking account depended solely on whether there was enough money in Marywood's checking account. That is, if there was money in Marywood's checking account, the debt would be paid through the account. If not, then HBC would either transfer money to the account or pay the debt directly.

Before the stock acquisition, Marywood owed money to HBC and this debt was shown as an account receivable on HBC's books and records.

---

[10]The account was finally closed out by HBC on Sept. 7, 1979, several months after the dissolution of Marywood under State law, and the remaining balance was transferred to the HBC checking account.

On November 30, 1977, HBC's accountant transferred $32,984.80 from accounts receivable to the account for HBC's investment in Marywood. On December 31, 1978, HBC's accountant transferred $47,569 from accounts receivable to the account for HBC's investment in Marywood. The balance sheets attached to HBC's tax returns for 1977, 1978, and 1979 reflect HBC's investment in Marywood (as well as several other corporations) comprising Marywood's expenses paid by HBC, the transfer of loans owed HBC by Marywood from HBC's accounts receivable, and the cost of the stock paid by HBC to the Marywood shareholders. HBC's 1977 tax return (filed March 14, 1978) refers to the item as an investment in "Marywood Corp."; its 1978 and 1979 returns use the term "Marywood Division".

In preparing tax returns for Marywood, the accountant reported income, expenses, and a net operating loss for 1977 on Marywood's tax returns, but 1978 income and expenses, if any, incurred for Marywood on HBC's 1978 tax returns. A claim for refund in the amount of $387, however, was made by Marywood on its 1978 Indiana State return and subsequently was allowed by the State of Indiana.

---

When HBC acquired Marywood (June 18, 1977), HBC intended to liquidate Marywood at some time; however, HBC did not form an intent to liquidate Marywood promptly until the fall of 1978, as a result of respondent's examining agent's raising the issue of HBC's subchapter S corporation status.

## OPINION

Under section 1372(b)(1),[11] a subchapter S corporation generally is not subject to the corporate income tax;

---

[11]SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

(b) EFFECT.—If a small business corporation makes an election under subsection (a), then—

(1) with respect to the taxable years of the corporation for which such election is in effect, such corporation shall not be subject to the taxes imposed by this chapter * * *

[The subsequent revision of this provision by sec. 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant case. Provisions similar to the former sec. 1372(b)(1) appear in sec. 1363(a), applicable to taxable years beginning after Dec. 31, 1982 (sec. 6(a) of the act).]

instead, under section 1373(a),[12] the corporation's income is taxed to the shareholders. Concomitantly, when a subchapter S corporation makes a qualified investment, section 48(e)[13] provides that the qualified investment is passed through to the shareholders for purposes of calculating the investment credit allowed by section 38.

Under section 1372(e)(3)[14] if a corporation ceases to be a small business corporation, as defined in section 1371(a),[15] then the corporation loses its subchapter S corporation status and its income, deductions, and credits are taxed to

---

[12]SEC. 1373. CORPORATION UNDISTRIBUTED TAXABLE INCOME TAXED TO SHAREHOLDERS.

(a) GENERAL RULE.—The undistributed taxable income of an electing small business corporation for any taxable year shall be included in the gross income of the shareholders of such corporation in the manner and to the extent set forth in this section.

[The subsequent revision of this provision by sec. 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant case. Provisions similar to the former sec. 1373(a) appear in 1366(a)(l)(A), applicable to taxable years beginning after Dec. 31, 1982 (sec. 6(a) of the act).]

[13]SEC. 48. DEFINITIONS; SPECIAL RULES.

(e) SUBCHAPTER S CORPORATIONS.—In the case of an electing small business corporation (as defined in section 1371)—

(1) the qualified investment for each taxable year shall be apportioned pro rata among the persons who are shareholders of such corporation on the last day of such taxable year; and

(2) any person to whom any investment has been apportioned under paragraph (1) shall be treated (for purposes of this subpart) as the taxpayer with respect to such investment, and such investment shall not (by reason of such apportionment) lose its character as an investment in new section 38 property or used section 38 property, as the case may be.

[The subsequent repeal of this provision by sec. 5(a)(7) of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, 1692, does not affect the instant case. Provisions encompassing the substance of the former sec. 48(e) appear in secs. 1366(a)(1)(A) and 1366(b), applicable to taxable years beginning after Dec. 31, 1982, (sec. 6(a) of the act).]

[14]SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

(e) TERMINATION.—

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) CEASES TO BE SMALL BUSINESS CORPORATION.—An election under subsection (a) made by a small business corporation shall terminate if at any time— \* \* \* the corporation ceases to be a small business corporation (as defined in section 1371(a)). Such termination shall be effective for the taxable year of the corporation in which the corporation ceases to be a small business corporation and for all succeeding taxable years of the corporation.

[The subsequent revision of this provision by sec. 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant case. Provisions similar to the former sec. 1372(e)(3) appear in sec. 1362(d)(2), applicable to taxable years beginning after Dec. 31, 1982 (sec. 6(a) of the act).]

[15]SEC. 1371. DEFINITIONS.

(a) SMALL BUSINESS CORPORATION.—For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) \* \* \*

[The subsequent revision of this provision by sec. 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant case. Provisions similar to the former sec. 1371(a) appear in sec. 1361(b)(2)(A), applicable to taxable years beginning after Dec. 31, 1982 (sec. 6(a) of the act).]

the corporation and not passed through to the shareholders. Section 1371(a) provides that a subchapter S corporation may not be a member of an affiliated group, as defined in section 1504.[16] Section 1371(d)[17] provides a special definition, that for purposes of section 1371(a), a subchapter S corporation will not be considered a member of an affiliated group for a taxable year because of its ownership of a controlled corporation if the controlled corporation (1) has not yet begun business since its incorporation and before the close of the taxable year, and (2) has no taxable income for the period included within the subchapter S corporation's taxable year.

Respondent contends that petitioners are not allowed to pass through HBC's income and investment tax credits for 1977 because HBC's subchapter S corporation status terminated under section 1372(e)(3) during 1977; accordingly, HBC is subject to corporate income taxes for 1977. Respondent maintains that this is so because HBC became a member of an affiliated group as a result of HBC's acquisition of 100

---

[16]SEC. 1504. DEFINITIONS.

(a) DEFINITION OF "AFFILIATED GROUP".—As used in this chapter, the term "affiliated group" means one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation if—

(1) Stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of each of the includible corporations (except the common parent corporation) is owned directly by one or more of the other includible corporations; and

(2) The common parent corporation owns directly stock possessing at least 80 percent of the voting power of all classes of stock and at least 80 percent of each class of the nonvoting stock of at least one of the other includible corporations.

As used in this subsection, the term "stock" does not include nonvoting stock which is limited and preferred as to dividends, employer securities within the meaning of section 301(d)(9)(A) of the Tax Reduction Act of 1975, or qualifying employer securities within the meaning of section 4975(e)(8) while such securities are held under an employee stock ownership plan which meets the requirements of section 301(d) of such Act or section 4975(e)(7), respectively.

[The subsequent revision of this provision by sec. 60(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 577, applicable to taxable years beginning after Dec. 31, 1984 (sec. 60(b)(1) of Pub. L. 98-369), does not affect the instant case.]

[17]SEC. 1371. DEFINITIONS.

(d) OWNERSHIP OF CERTAIN STOCK.—For purposes of subsection (a), a corporation shall not be considered a member of an affiliated group at any time during any taxable year by reason of the ownership of stock in another corporation if such other corporation—

(1) has not begun business at any time on or after the date of its incorporation and before the close of such taxable year, and

(2) does not have taxable income for the period included within such taxable year.

[The subsequent revision of this provision by sec. 2 of the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, does not affect the instant case. Provisions similar to the former sec. 1371(d) appear in sec. 1361(c)(6), applicable to taxable years beginning after Dec. 31, 1982 (sec. 6(a) of the act).]

percent of the Marywood stock on June 18, 1977. Moreover, respondent maintains that the exception provided in section 1371(d) for acquisitions of inactive corporations does not apply in the instant case because Marywood was actively engaged in business after its incorporation and, after its acquisition by HBC, Marywood did not become an inactive corporation whose separate corporate existence is to be ignored.

On brief, petitioners concede that—

by the express statutory language of the IRC, it is apparent that the fact that Haley [HBC] in 1977 acquired all of the capital stock of Marywood, made Haley and Marywood an "affiliated group" and terminated Haley's election to be taxed as a small business corporation.

Petitioners also concede that "the exception provided for in *IRC Section 1371(d)* does not apply in the case at bar." (Emphasis in original.) They contend, however, that we should not hold that HBC and Marywood constitute an affiliated group, because (1) "the separate formal corporate existence of Marywood as a subsidiary of Haley [should] be ignored", and (2) HBC's acquisition of Marywood's stock should be treated as an acquisition of Marywood's assets, especially since HBC complied with the requirements of sections 332 and 334(b)(2) by liquidating Marywood within 2 years after acquiring Marywood's stock.

We agree with respondent that HBC became affiliated with Marywood on June 18, 1977, and, thus, HBC's subchapter S corporation status terminated for 1977.

Subchapter S was added to the Code by section 64(a) of the Technical Amendments Act of 1958, Pub. L. 85-866, 72 Stat. 1606, 1650. The Senate Finance Committee report stated generally that "The right to elect the treatment provided under this new subchapter is limited to what are defined as small business corporations. These corporations must be domestic corporations which are not eligible to file a consolidated return with any other corporation. * * * [T]he election as to the treatment under this new subchapter is to be terminated if the corporation ceases to qualify as a small-business corporation." S. Rept. 85-1983, at 88-89 (1958), 1958-3 C.B. 992, 1009-1010. See also H. Rept. 85-2632 (Conf.), at 36 (1958), 1958-3 C.B. 1188, 1223.

The regulations promulgated under section 1371 make it clear that whether or not the corporations actually file consolidated returns is irrelevant;[18] the sole criterion in determining affiliation, for subchapter S corporation purposes, is the requisite stock ownership.

In an effort to clarify further that a small business corporation could not be a member of an affiliated group, the Congress, in the same legislation that gave rise to section 1371(a), also amended section 1504(b) by adding a new paragraph (8). That amendment provided that the definition of "includible corporation," for purposes of section 1504(a), would not include an electing small business corporation as defined in section 1371. It was subsequently recognized that the amendment was drafted in such a way as to allow small business corporations to be members of affiliated groups. Thus, the Congress repealed paragraph (8) of subsection 1504(b) (sec. 2(c) of Pub. L. 86-376, 73 Stat. 699 (1959)). At the time this repeal was being considered, Senator Byrd of Virginia provided the following additional reasoning for disallowing small business corporations from being members of affiliated groups:

> Subsection (c) strikes out paragraph (8) of section 1504(b) of the code and thereby clarifies the definition of a small business corporation. The existing statute defines a small business corporation as one which, among other things, is not a member of an affiliated group. *This rule is intended to preclude the accumulation of corporate earnings in a subsidiary and thus avoid the taxation of those earnings to the shareholders of the subchapter S corporation.* However, paragraph (8) of section 1504(b), which was enacted to insure this result, actually has the opposite effect by permitting the acquisition of a subsidiary by a small business corporation after the election has been made. This amendment would prevent acquisition of an 80-percent-owned subsidiary at any time. Subsection (c) would take effect on the day after the date of enactment of this act. [105 Cong. Rec. 18898 (Sept. 10, 1959). Emphasis added.]

---

[18]Sec. 1.1371-1. Definition of small business corporation.

(a) *In general.* For purposes of subchapter S, chapter 1 of the Code and sections 1371 through 1.1378-3, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group of corporations (determined in accordance with paragraph (c) of this section) * * *

 * * * * * * *

(c) *Member of an affiliated group.* (1) Except as otherwise provided in subparagraph (2) of this paragraph, a corporation which is a member of an affiliated group of corporations, as defined in section 1504, is not a small business corporation, whether or not such affiliated group has ever filed a consolidated return. * * *

In the Revenue Act of 1964, the Congress carved out an exception to the general rule of section 1371(a) by enacting section 1371(d). The report of the Senate Finance Committee on the 1964 Act explains the law as follows (S. Rept. 88-830, at 146-147 (1964), 1964-1 C.B. (Part 2) 502, 650-651):[19]

42. Small business corporations: Ownership of certain stock disregarded (sec. 235(a) of the bill and sec. 1371 of the code)

(a) *Present law.*—In 1958 Congress added to the Internal Revenue Code a new subchapter (sec. 1371 and following) * * *

The right to elect the treatment provided under the new subchapter was limited to small business corporations in part because of the complexity involved in passing the earnings of a corporation through to its shareholders where the stock of the corporation is held by a widely diversified group of shareholders, and in part because it was thought that only the relatively small corporations were essentially comparable to the partnership or proprietorship where the earnings are taxed to the owners rather than to the business organization. As a result, Congress provided that corporations making this election must be domestic corporations which are not eligible to file a consolidated return with any other corporation. * * *

(b) *General reasons for provision.*—Situations have been called to your committee's attention where corporations are denied the privilege of electing to have their income taxed to their shareholders (rather than to the corporation) merely on the grounds that the corporation owns the stock of completely inactive subsidiaries.

The establishment of inactive subsidiaries is a common business practice for corporations planning for future growth. Such corporations often desire to reserve their corporate name in States in which they are not yet doing business by establishing subsidiaries with the same or a similar name to that of the parent corporation. Your committee sees no reason to penalize the parent corporation by denying it the privilege of electing to pass the income through to its shareholders for tax purposes merely because, for business reasons, it has established these inactive subsidiaries which constitute an affiliated group which could file a consolidated return.

(c) *General explanation of provision.*—As a result of the considerations set forth above, this provision adds a new subsection to section 1371 of the code providing that a corporation will not be considered a member of an affiliated group for purposes of this election (and, therefore, not be denied the right to elect subch. S status) merely because it owns stock in another corporation which is inactive. An inactive corporation, *in this case,* is one that has not begun business after the date of its

---

[19] The text of sec. 235(a) of H.R. 8363, as reported by the Senate Finance Committee, which is described in this extract from the committee report, is identical to sec. 233(a) of the Revenue Act of 1964, Pub. L. 88-272, 78 Stat. 19, 112. See H. Rept. 88-1149 (Conf.), at 15, 51-52 (1964), 1964-1 C.B. (Part 2) 774, 788, 824-825.

incorporation and before the end of the parent corporation's taxable year in question and that does not have taxable income for this taxable year. If these conditions are met and the parent is not affiliated with any other corporation, an election may be filed under subchapter S by the parent corporation despite the rule that a subchapter S corporation may not be a member of an affiliated group. However, if the subsidiary corporation does not meet the conditions set forth above in a subsequent year, the parent corporation's subchapter S status would be terminated at that time. [Emphasis added.]

The 1964 Act amendment was a congressional response to a limited problem. Although the Congress recognized the plight of subchapter S corporations with inactive subsidiaries, it chose to grant relief only where the inactive subsidiaries met the rigorous requirements of section 1371(d). We note that the Congress carefully tailored the relief so that it applies only where it would be impossible to have what Senator Byrd described in the 1959 Act debate as "the accumulation of corporate earnings in a subsidiary and thus avoid the taxation of those earnings to the shareholders of the subchapter S corporation." 105 Cong. Rec. at 18898.

The approach that the Congress has used in this regard is prophylactic; i.e., the possibly abusive situation is prohibited without regard to whether an abuse has occurred. For example, it is irrelevant whether the subsidiary has only losses and so there is no improper "accumulation of corporate earnings". Similarly, if the subsidiary had conducted business before being acquired by the subchapter S corporation (or before the subchapter S election had been made), then it is irrelevant that the subsidiary is not in business during the period that it is a subsidiary of a subchapter S corporation.

One might argue that the Congress made the wrong choice. Alternatively, one might argue that, if the Congress had been presented with the factual situation of the instant case, then the Congress would have provided relief broad enough to cover the instant case. However, the reality we face is that (1) the policy choice is to be made by the Congress, and (2) as petitioners concede, HBC does not qualify for relief under the provision that the Congress chose to enact. Even if we were to agree that the Congress should make the relief of section 1371(d) more widely

available, or that the Congress would have made the relief available to situations such as that in the instant case if only the matter had been presented, we do not have authority to change the law that the Congress enacted. See, e.g., *Reed v. Commissioner*, 82 T.C. 208, 213-214 (1984), and cases there cited.

We conclude that HBC's ownership of Marywood may not be disregarded, because Marywood did not satisfy the requirements of section 1371(d) during 1977. Marywood's essentially inactive status does not change our conclusion. HBC's, or John's, intention to liquidate Marywood does not change our conclusion.

The conclusion we reach comports with the case law that has developed in this area. In *May v. United States*, 644 F.2d 578 (6th Cir. 1981), revg. an unreported case (E.D. Ky. 1978, 42 AFTR 2d 78-5328, 78-2 USTC par. 9564), the Court of Appeals held that the subchapter S election was not available to a corporation that, pursuant to an earlier asset acquisition from another corporation, had acquired 100 percent of the stock of a subsidiary of the selling corporation. The court agreed with the District Court's rejection of the plantiff's alternative arguments that there had been a practical liquidation of the subsidiary and that the subsidiary had not begun business for purposes of section 1371(d). However, the Court of Appeals disagreed with the District Court's conclusion that, despite the fact that the subsidiary had begun business within the meaning of section 1371(d), its corporate identity should be disregarded because the subsidiary had become inactive and because the parent had acted towards the subsidiary's property as if it were the owner. The Court of Appeals concluded as follows (644 F.2d at 580):

It is also clear that Oldsmar [the subsidiary] had "begun business" within the meaning of sec. 1371(d). * * * That *Oldsmar may have become inactive after its acquisition by Florida Downs [the subchapter S corporation] is irrelevant*; the beginning of business "at any time after the date of incorporation" and before the close of the tax years in question precludes reliance on sec. 1371(d).

We disagree, however, with the District Court's conclusion that Oldmar's corporate identity should be disregarded. Florida Downs was free to organize its affairs as it chose. It did so in a manner which made it a member of an affiliated group. Having made that decision, the

shareholders of Florida Downs "must accept the tax consequences of [their] choice, whether contemplated or not." *Commissioner v. National Alfalfa Dehydrating and Milling Co.*, 417 U.S. 134, 149 * * * [Emphasis added.]

In *Barnes Motor & Parts Co. v. United States*, 309 F. Supp. 298 (E.D. N.C. 1970), the court agreed with the United States that the affiliated group requirements of section 1371(a) must be strictly construed. (309 F. Supp. at 303.) The court thus held that a corporation's election to be a subchapter S corporation was void from its inception, even though the corporation, after its subchapter S election but before the years in issue, disposed of 60 percentage points of the 87½-percent stock ownership it held in a subsidiary corporation. Moreover, the court stated that even if it were to disregard the disqualifying stock ownership at the time of the election because the corporation remedied this defect before the years in issue, the court would disallow subchapter S corporation status on grounds that the corporation controlled another subsidiary for almost 3 months during one of the years in issue. In so holding, the court stated as follows (309 F. Supp. at 304):

Although the ownership of the subsidiary was merely a temporary arrangement which was part of a plan of liquidation, the plaintiff carried out the plan apparently without consideration for the consequences it might have on the Subchapter S election. The Court therefore feels that such manipulation offers further grounds to support the finding that the plaintiff did not meet the statute's affiliated-group requirement.

As was the case in *May*, Marywood had begun business after its incorporation and, thus, the narrow exception to the general rule of nonaffiliation is inapplicable here. Petitioners chose, for proper business reasons, to organize its affairs by keeping Marywood in existence. As in *Barnes Motor*, petitioners in the instant case apparently did not consider the consequences the continued existence of Marywood would have on HBC's subchapter S status. However, having made the decision to acquire Marywood's stock rather than Marywood's assets, petitioners must accept the tax consequences of their choice. Thus, we will not disregard HBC's stock ownership of Marywood.[20]

---

[20] In *Coca-Cola Bottling Co. of Gallup v. United States*, 443 F.2d 1253 (10th Cir. 1971), the Court of Appeals refused to disregard the separate corporate status of a subsidiary of a

While it is well established that the economic substance will control the tax consequences rather than the form, (*Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939)), "We will not relieve a party from the tax consequences of the form in which he or she appears to have molded a transaction, in the absence of proof that that form does not properly reflect the transaction." *Yamamoto v. Commissioner*, 73 T.C. 946, 954 (1980), affd. without published opinion 672 F.2d 924 (9th Cir. 1982).

In *Don E. Williams Co. v. Commissioner*, 429 U.S. 569, 579-580 (1977), the Supreme Court, albeit in a somewhat different context, gave the following guidance:

2. The taxpayer suggests that the transaction equates with a payment of cash to the trustees followed by a loan, evidenced by the note in return, in the amount of the cash advanced. But

"a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred.

" * * * This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Commissioner v. National Alfalfa Dehydrating*, 417 U.S. 134, 148-149 * * * (1974).

See *Central Tablet Mfg. Co. v. United States*, 417 U.S. 673, 690 * * * (1974). What took place here is clear, and income tax consequences follow accordingly. We do not indulge in speculating how the transaction might have been recast with a different tax result. [Fn. ref. omitted.]

Petitioners chose to follow the form of buying Marywood, rather than buying Marywood's assets, and did so for valid nontax reasons. Petitioners chose to follow the form of keeping Marywood in existence, and did so for valid nontax reasons.

corporation that claimed it was a subchapter S corporation. The Court of Appeals stated as follows (443 F.2d at 1254):

"To sustain their position that Gallup Company [the subsidiary] was a sham, counsel cite a number of cases, e.g., *Shaw Construction Company v. Commissioner of Internal Revenue*, 9 Cir., 323 F.2d 316, where the challenge to the corporate entity was made by the taxing authorities. The Commissioner has greater freedom and responsibility to disregard the corporate entity than does either that corporate entity or its creator. See *Commissioner of Internal Revenue v. State-Adams Corporation*, 2 Cir., 283 F.2d 395, 398-399, cert. denied 365 U.S. 844, 81 S.Ct. 802, 5 L.Ed.2d 809. In our opinion, Gallup Company was organized for a business purpose, carried on business activities, and received taxable income. It cannot escape federal income tax liability on the theory that it was a sham."

We do not find in the record of the instant case any justification for giving petitioners the tax benefits that would have been available if they had acted differently. The tax consequences—loss of subchapter S status and the matters that flow from this loss—are those that follow from the choices petitioners made. Petitioners make an alternative argument, that there was a practical liquidation of Marywood at the time HBC acquired it, such that the acquisition, in reality, was one of assets rather than stock. Thus, petitioners argue that we need not ever reach the question of affiliation under section 1371(a). We cannot agree with this view. Rather, we conclude that, notwithstanding petitioners' intent to liquidate Marywood eventually, no such liquidation occurred on June 18, 1977, because, as noted above, there was a business purpose for the continued existence of Marywood. Moreover, we conclude that Marywood was operated after the June 18, 1977, acquisition in accordance with that business purpose.

In *May v. United States, supra,* the Court of Appeals agreed with the District Court's rejection of the plaintiffs' claim that there had been a practical liquidation of a corporate subsidiary such that there was no affiliation under section 1371(a) (644 F.2d at 579), thereby implicitly approving the following analysis of the District Court (*May v. United States,* 42 AFTR2d at 78-5329—78-5330, 78-2 USTC par. 9564 at 84,760) on the "practical liquidation" issue:

While it has been held that a liquidation does not require a formal declaration of same, if the shareholders have adopted a plan of liquidation and enacted it, *Alameda Realty Corp. v. Commissioner,* 42 T.C. 273 (1964), this Court finds neither a formal declaration nor a de facto liquidation in this instance. Title to the property was retained by Oldsmar, tax returns were filed by Oldsmar, stock in the corporation was transferred and the corporation did in fact retain its corporate identity.

In *May,* the subsidiary was acquired by the subchapter S corporation in 1969. Although the subsidiary filed income tax returns for 1969, 1970, and 1971, it reported no income; its tax returns bore the notation "CORPORATION INACTIVE". The subsidiary did not have any office, bank account, or employees. It did not negotiate any lease or receive any rent. The subchapter S corporation paid all

expenses relating to the property that the subsidiary owned.

As in *May*, in the instant case no formal plan of liquidation was adopted until November 22, 1978. Marywood, after the acquisition of its stock by HBC, held real property, maintained a checking account, sold real estate, complied with statutory corporate formalities, paid expenses, and filed tax returns. Moreover, the continued corporate existence of Marywood subsequent to June 18, 1977, served a business purpose in that it prevented HBC from becoming liable on a mortgage and in pending litigation. Thus, we cannot say that there was a practical liquidation of Marywood such that HBC, in reality, acquired the assets of Marywood rather than its stock.

Petitioners draw our attention to several Revenue Rulings that appear to bear on the issue in the instant case. In Rev. Rul. 73-496, 1973-2 C.B. 312, respondent chose to ignore (for purposes of section 1371(a)) a 30-day period during which a subchapter S corporation controlled a subsidiary which was liquidated under section 334(b)(2). Respondent maintains that his ruling is correct but that we should draw a line between the ruling's 30-day relationship and the instant case's 2-year relationship. Yet in analogous circumstances, involving interpretation of the same definition we seek to apply in the instant case—affiliated group within the meaning of section 1504—respondent first approved ignoring a 30-day relationship (Rev. Rul. 70-391, 1970-2 C.B. 3) and then explicitly "clarified" his earlier ruling so that, as so clarified, respondent approved ignoring a 2-year relationship. (Rev. Rul. 73-461, 1973-2 C.B. 10.) Respondent has already ventured onto this slippery slope; indeed, he has already slipped past the point that petitioners would have us reach. We do not regard any of these three rulings as being consistent with the statute as enacted by the Congress in 1958 and as modified and explained by the Congress in 1959 and 1964. We need not deal in the instant case with the "momentary" relationship problem of Rev. Rul. 72-320, 1972-1 C.B. 270. We will not draw a line between the instant case and the 30-day period of Rev. Rul. 73-496. We hold that the statute forbids us to ignore HBC's

relationship with Marywood. Our analysis would be the same if this relationship had lasted only 30 days.[21]

Finally, petitioners contend that their position is supported by Indiana's decision to refund the $387 gross income tax apparently paid by Marywood in 1978 in connection with John, Jr.'s purchase of a Marywood Subdivision lot. Their argument is that, under Indiana law, a subchapter S corporation is not liable for this tax, HBC was a subchapter S corporation, Marywood was not then a subchapter S corporation, Indiana refunded the tax, and so Indiana must have recognized that Marywood's existence should be ignored and HBC was the real grantor of the lot to John, Jr.

The parties have stipulated that Marywood's board of directors consented to the sale. Marywood is the grantor on the deed. The mortgagee bank's check is payable to Marywood. We do not know what analysis was followed by the Indiana tax officials in apparently first requiring Marywood to pay the tax and then refunding the tax. We do not give significant weight to this $387 payment and reimbursement in considering the $50,000 status issue before us.

We hold for respondent on this issue.

*Decision will be entered for the respondent.*[22]

---

[21]In any event, as we recently stated in *Stark v. Commissioner*, 86 T.C. 243, 250-251 (1986):

"Absent special circumstances, a revenue ruling merely represents the Commissioner's position with respect to a specific factual situation. See *Stubbs, Overbeck & Associates, Inc. v. United States*, 445 F.2d 1142, 1146-1147 (5th Cir. 1971); *Crow v. Commissioner*, 85 T.C. 376, 389 (1985), and cases cited therein. * * * Whereas this Court or any other court may adopt the conclusion and rationale of a revenue ruling, revenue rulings typically do not constitute substantive authority for a position. * * * ,,

[22]In their petition, petitioners contend that, if we were to hold that HBC's subchapter S status terminated in 1977, then HBC should be entitled to deduct for 1977 the Indiana income tax for which it would become liable. At trial, we brought this matter to petitioners' attention. Petitioners indicated that they had no evidence on this point. Petitioners' briefs do not deal with this point. We deem petitioners to have conceded this point.